CONSUELO CABINERO LEÓN, demandante y recurrida, *v.*
COBIÁN THEATRES OF PUERTO RICO, INC., demandada y
recurrente. HANOVER FIRE INSURANCE CO., interventora
y recurrida.

Número 11658.

*Sometido:* 23 de mayo de 1958. *Resuelto:* 30 de junio de 1960.

*Víctor Gutiérrez Franqui, Luis F. Sánchez Vilella* y *C. Morales, Jr.,* abogados de la recurrente; *Juan Enrique Géigel, Guillermo Silva, Jaime A. García Blanco* y *Hernán G. Pesquera,* abogados de la demandante y recurrida; *F. Ponsa Feliú* y *Luis Blanco Lugo,* abogados de la interventora recurrida.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

En la noche del 17 al 18 de mayo de 1949 se desarrolló un incendio en el edificio del Teatro Rex de Cataño, dejándolo prácticamente destruido. La demandante, dueña y arrendadora de la propiedad, interpuso esta demanda contra Cobián Theatres of Puerto Rico, Inc. como arrendataria del teatro, reclamándole en concepto de daños y perjuicios el pago de (1) $58,797.43 costo de reconstrucción del edificio y repara-

ción de las averías y desperfectos sufridos en el mismo; (2) $7,565 costo de reparación de ciertas instalaciones especiales propias de este negocio; y (3) $18,011 valor del equipo de proyección y reproducción de sonidos, butacas, pantalla, ventiladores mecánicos y otro equipo mueble que se destruyó totalmente. Reclamó además cánones de arrendamiento a razón de $375 mensuales dejados de percibir desde el incendio hasta la fecha de la demanda, 26 de octubre de 1949, por el monto de $2,033.25 más los cánones a devengarse durante la tramitación del pleito.

Alegó la demandante que ella era dueña de la propiedad en que ubicaba el Teatro Rex y del equipo para la proyección de películas y otros bienes muebles instalados en el teatro; que desde el 1ro. de agosto de 1947 y en virtud de un contrato de arrendamiento por 10 años la demandada entró en posesión del teatro y sus anexos así como del equipo mueble instalado en el mismo, pagando un canon de $375 mensuales; que el 18 de mayo de 1949 se desarrolló un incendio en dicho edificio que lo destruyó totalmente con el equipo cinematográfico y demás muebles; que antes del 18 de mayo Cobián Theatres había subarrendado a otro parte del edificio del teatro para la explotación de un negocio de bar en que servían comidas utilizando cocinas de gas flúido, sin que la demandante fuera notificada de tal subarrendamiento; que el incendio se desarrolló, según información de la demandante, en una cocina de gas en la parte subarrendada; y que como resultado de dicho incendio la demandante sufrió los daños antes reclamados. Alegó además que a partir del incendio Cobián dejó de pagar el canon mensual de arrendamiento.

La demandada contestó aceptando el arrendamiento del edificio, la ocurrencia del incendio, y el hecho de no haber satisfecho los cánones después que ocurrió éste. Negó otros extremos y alegó afirmativamente que el equipo y las instalaciones de cinematografía eran de su exclusiva propiedad y no de la arrendadora; que cesó en la posesión de la propiedad desde la fecha del incendio por haberse inutilizado ésta para

los fines para los cuales la tomó en arrendamiento, sin que la demandante la hubiera reconstruido y puesto a su disposición; que no estaba en posesión de la propiedad al radicarse la demanda; que cuando entró en posesión del inmueble en 1947 la parte del edificio que se alega ella subarrendó para restaurante o bar ya estaba en posesión de otro como subarrendatario de un arrendatario anterior, y era destinada a los mismos fines con conocimiento de la demandante, y desde 1936 existía en el edificio principal un local destinado a bar; y que el incendio se produjo sin que mediara culpa o negligencia de la demandada o de persona alguna cuya culpa o negligencia pudiera imputársele. También alegó Cobián Theatres que el edificio estaba cubierto con una póliza de seguro por $35,000 con Hanover Fire Insurance Co. y en junio 30 de 1949 esta compañía pagó a la demandante por su pérdida la cantidad de $21,884.75; que las pérdidas sufridas ascendieron a esa suma y que desde esa fecha la compañía quedó subrogada en los derechos y acciones de la demandante, no teniendo ésta interés ni causa de acción en cuanto a daños por la destrucción del edificio.

Sometido el caso[1] el Tribunal Superior concluyó que el edificio arrendado consistía de un local principal dedicado a cinematógrafo que había sido clausurado 18 meses antes, y otro local independiente habilitado para y dedicado a cantina que ocupaba un tercero como subarrendatario de Cobián; que

---

[1] El caso comenzó a verse el 23 de enero de 1951 ante el Hon. Pedro Pérez Pimentel y continuó los días 13 y 14 de marzo, desfilando toda la prueba de ambas partes. Los abogados pidieron la transcripción de la evidencia a los fines de preparar sus alegatos y pendientes estos trámites el Hon. Pedro Pérez Pimentel fue nombrado Magistrado de este Tribunal. Más de dos años después, en 30 de noviembre de 1953, se permitió una demanda de la interventora Hanover Fire Ins. Co. quien alegó haber satisfecho a la dueña del edificio, en junio 30, 1949, la cantidad de $21,884.75 en pago de la pérdida sufrida por ella por este incendio y solicitó sentencia contra Cobián hasta dicha suma con intereses desde junio 30, 1949. El 18 de marzo de 1954 se celebró una nueva vista ante el Hon. Jesús A. González y se acordó someterle el caso a base del récord taquigráfico. Ante el Juez González declararon brevemente tres testigos, dos como prueba de refutación de la interventora, y uno de contrarrefutación de la demandada.

el costo de reconstrucción del edificio a la fecha del fuego, menos la depreciación era de $26,333.39; que ciertas instalaciones destruidas eran propiedad de la demandante y les fijó un valor recobrable de $8,912.98, y que otro equipo cinematográfico consistente de butacas, pantalla, ventiladores, el equipo de proyección, así como otros muebles no pertenecían a la arrendadora y sí a la arrendataria demandada. Expresó que la prueba no le permitía hacer conclusiones en cuanto al término necesario para efectuar las reparaciones que hubieran permitido arrendar de nuevo el edificio, ni sobre el término razonable para lograr arrendarlo. En relación con otros extremos, concluyó el tribunal que en la cantina subarrendada se expendían bebidas gaseosas y comidas para lo cual se utilizaba una cocina de gas flúido, y que el incendio se originó en la cocina de dicha cantina y de allí se extendió al resto del edificio. Halló probado que antes del 18 de mayo hubo en el edificio dos conatos de incendio: después del primero la demandada quitó los fusibles, condenó las puertas del teatro "para evitar que entraran maleantes", con excepción de una para dar acceso a la persona que limpiaba, tenía extinguidores y hacía limpiar con bastante frecuencia los alrededores del edificio recogiéndose la basura y papeles. Un empleado de Cobián realizaba inspecciones mensuales para determinar si el teatro estaba clausurado y limpio. Después que se clausuró el mismo los empleados de la arrendataria no visitaron la cantina.

En sus conclusiones de derecho el tribunal sentenciador fue de opinión que la demandada respondía de los daños. Resolvió que la cosa perdida en poder del arrendatario se presume que lo fue por su culpa y no por causa fortuita; que en el caso específico de incendio el arrendatario responde a menos que pruebe que el siniestro provino de causa extraña y no hubo por su parte culpa o negligencia, y que si no probare la causa u origen del incendio el arrendatario no descarga su responsabilidad y se aplicará entonces la presunción de que se debió a culpa suya. Aún cuando asumiera, continuó ex-

presando el tribunal a quo, que el arrendatario se exonera de responsabilidad demostrando que cuidó de la propiedad con la diligencia de un buen padre de familia, la prueba estaría incompleta porque si bien podía afirmarse que Cobián tomó varias precauciones para evitar un incendio, éstas se limitaron al local destinado a cinematógrafo, pero el incendio no se había iniciado en este local sino en la cantina contigua y no existía prueba que demostrara que se tomaron precauciones en la cantina para evitar un incendio en la misma. De acuerdo con sus conclusiones dictó sentencia condenando a la demandada a satisfacer $26,333.39 costo de reconstrucción del edificio de cuya suma $21,884.75 debía pagarse a la interventora Hanover Fire Ins. Co. y la diferencia de $4,448.64 a la demandante con la suma de $8,912.98 por concepto de las instalaciones destruidas.

Ambas partes apelaron aunque sólo tendremos que considerar la apelación de la demanda.(²) Esta imputa al tribunal a quo haber cometido los siguientes errores: (1) al resolver que la demandada responde de la pérdida ocurrida en la propiedad arrendada por no haber demostrado que el incendio se debiera a una causa fortuita; (2) al determinar que la demandada no probó haber usado de la cosa arrendada con la diligencia de un buen padre de familia; (3) al asumir que correspondía a la demandada refutar por la preponderancia de la prueba la presunción de culpa que establece el art. 1453 del Código Civil ; (4) que la presunción de culpa que establece este artículo priva a la demandada de su propiedad sin debido proceso de ley y es contraria a las Enmiendas V y XIV de la Constitución de Estados Unidos y a la Sección 7 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico; y (5) que el tribunal erró al conceder a la demandante el valor de las instalaciones especiales

---

(²) La demandante se limitó a radicar un escrito de apelación sin más gestiones para perfeccionar la misma. Al contestar el alegato de la demandada tampoco ha discutido aquella parte de la sentencia que le fue adversa a la luz de lo reclamado por ella.

del Teatro Rex no obstante no haber ella establecido dicho valor a la fecha del incendio.

■■■ Son directamente aplicables a este caso los arts. 1445(2), 1451, 1453, 1458, 1136 y 1137 del Código Civil (ed. 1930) 31 L.P.R.A. 4052, 4058, 4060, 4065, 3191 y 3192. El 1445(2) obliga al arrendatario a usar de la cosa arrendada como un diligente padre de familia, destinándola al uso pactado; y en defecto de pacto, al que se infiera de la naturaleza de la cosa arrendada según la costumbre de la tierra. El art. 1451 le impone la obligación de *devolver* la finca, al concluir el arriendo, *tal como la recibió*, salvo lo que hubiese perecido o se hubiera menoscabado por el tiempo o por causa inevitable. El 1453 hace al arrendatario responsable del deterioro *o pérdida* que tuviere la cosa arrendada, *a no ser que pruebe haberse ocasionado sin culpa suya*. El 1458 estatuye que si se *pierde* la cosa arrendada o alguno de los contratantes falta al cumplimiento de lo estipulado, se observará respectivamente lo dispuesto en los arts. 1136 y 1137 y en los 1054 y 1077 del Código Civil.(3)

La prueba de las obligaciones incumbe, según el art. 1168, al que reclama su cumplimiento, y la de su extinción al que la opone. A tenor de lo dispuesto en el art. 1451 que impone al arrendatario la obligación de devolver la propiedad tal como la recibió, la demandante se limitó a ofrecer prueba del hecho en sí del incendio ocurrido que destruyó la propiedad y de los daños que alegó haber sufrido como consecuencia del mismo. *Ramírez Muñoz* v. *Muñoz*, 33 D.P.R. 362 (1924); *Del Valle* v. *M. González y Co.*, 39 D.P.R. 820 (1929). De acuerdo con el 1168 en concordancia con los arts. 1453, 1136 y 1137, co-

---

(3) El art. 1136—31 L.P.R.A. 3191 bajo el capítulo referente a la extinción de las obligaciones—dispone: "Quedará extinguida la obligación que consista en entregar una cosa determinada, cuando ésta se *perdiere* o destruyere *sin culpa del deudor* y antes de haberse éste constituido en mora". El art. 1137—31 L.P.A. 3192—: "Siempre que la cosa se hubiese perdido en poder del deudor, *se presumirá* que la pérdida ocurrió *por su culpa* y no por *caso fortuito*, salvo prueba en contrario, y sin perjuicio de lo dispuesto en el artículo 1049". (Bastardillas nuestras.)

rrespondía a la demandada probar que dicha obligación de devolver quedó extinguida por pérdida de la cosa. Ya en este plano, la cuestión gira en torno al hecho de si la demandada probó que la pérdida se ocasionó *"sin culpa suya"*—artículo 1452—, y en contrario a la presunción de que ocurrió por su culpa—artículo 1137—y no por caso fortuito o inexistencia de la culpabilidad, como lo llama Puig Peña hablando sobre el incumplimiento. (⁴) Hay que resolver pues, si en la pérdida de la cosa arrendada que de otro modo extinguiría la obligación de la aquí arrendataria de devolverla en el estado en que la recibió, medió o no culpa de su parte.

Al mencionar la culpa surge de inmediato a consideración el art. 1057 del Código Civil (ed. 1930)—31 L.P.R.A. 3021— el cual dispone que "La culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar"; y que "Cuando la obligación no exprese la diligencia que ha de prestarse en su cumplimiento, se exigirá la que correspondería a un buen padre de familia". Ocurre que el art. 1445 (2), particularmente aplicable a la relación arrendaticia, dispone igual norma de un diligente padre de familia en el uso de la cosa (*"culpa levis in abstracto"* del derecho romano). (⁵) El art. 1057 exige *a fortiori* una evaluación de los hechos y circunstancias específicos de cada caso en la determinación de la culpa o de su ausencia. (⁶) Veamos los hechos y circunstancias en las cuatro oca-

---

(⁴) Derecho Civil Español, Tomo IV, Vol. 1, pág. 237.

(⁵) M. M. Traviesas, *La Culpa*. Revista de Derecho Privado, Tomo 13, pág. 273 (289).

(⁶) Sobre este particular se expresa Don José Castán Tobeñas: "La esencia de la culpa ( . . . . . . . . ) está en la falta de diligencia y previsión que supone en el autor del acto. En este sentido define la culpa el Código Civil como 'la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar' (artículo 1.104).

". . . . . . . Pero modernamente, y como reacción contra la exagerada complicación de las teorías romanistas acerca de la graduación de la culpa, ha surgido la del arbitrio judicial, que entrega la apreciación de la culpa y de la extensión de sus responsabilidades a la sana crítica de los Tribunales,

siones en que el triunal ha tenido la controversia de este caso
ante su consideración: En *Ramírez Muñoz* v. *Muñoz*, 38 D.P.R.
19 (1928) el arrendatario de una casa de mampostería sita en
Caguas subarrendó parte para un establecimiento de pulpería,
otra parte para un almacén de tabaco y a un tercero. Du-
rante la noche se desarrolló un incendio que causó daños al
edificio. El dueño demandó al arrendatario y a los subarren-
datarios para que devolvieran la propiedad en el estado en que
se entregó o pagaran daños por el deterioro. Hubo prueba
demostrativa que después de apagado el fuego había tabaco
quemado y olor a gas (petróleo) ; que se encontraron latas
de gas sin abrir y sin quemar y que el fuego fue interno origi-
nado en el edificio. Para exonerarse de culpa, los demandados
declararon que registraban bien la pulpería antes de irse a
sus casas dejándola cerrada con llave; que había un sereno
del comercio que pagaban para vigilar las tiendas de la calle;
que al ocurrir el incendio estaba cerrada toda la casa y atri-
buían el mismo a la luz eléctrica porque había habido otros
incendios en Caguas debido a la luz; que en el establecimiento
vendían gas (petróleo) ; que el gas no se incendió porque no
hubo fuego en la parte en que estaba; que antes del incendio
tenían un puesto para vender gasolina pero habían suprimido

fundándose, como dice De Diego, en que siempre será necesario que el juez
atienda a las circunstancias especiales del caso, y entonces, cuando tenga
plena conciencia de ellas, no son necesarias reglas para fallar con arreglo
a la equidad(1). Las codificaciones más modernas siguen esta dirección;
así el Código alemán hace depender el deber de indemnización y la cuantía
de la misma del arbitrio del juez, que libremente pondera las circunstancias
(§ 254, ap. 1.º).

"Nuestro Código Civil establece como criterio general para los casos
en que en la obligación no se exprese la diligencia que ha de prestarse en su
cumplimiento, el de que ha de exigirse la que correspondería a un buen
padre de familia (artículo 1.104, apartado 2.º), que se toma como tipo medio
o normal de persona diligente (2). En esto el sistema del Código civil está
influido por el sistema romano, del que toma el tipo de la culpa leve (3).
Pero es de tener en cuenta que al definir la culpa el art. 1.104, ap. 1.º, en
los términos ya expuestos, parte de un punto de vista subjetivo, que hará
que sean los Tribunales en cada caso particular los que habrán de resolver
cuál era la diligencia procedente y, por ende, cuál es la culpa de que ha
de responder el deudor (1). Además, desde otro punto de vista, se inspira
el Código en la teoría del arbitrio judicial al autorizar que la responsabi-

·ese negocio; que el almacén donde estaba el negocio de tabaco .se cerraba a las seis de la tarde y tenía instalación eléctrica; ·que antes de acostarse solían pasar por el almacén y movían .las puertas para saber si estaban bien cerradas.

Considerando el art. 1466 (ed. 1911, 1453 ed. 1930), expresó el Tribunal revocando la sentencia que impuso responsabilidad al arrendatario:

"El conjunto y resumen de la prueba de los demandados es ·que ellos observaban la conducta de hombres prudentes en el uso de la casa en la parte que cada uno tenía subarrendada pues cerraban por las noches las puertas de la casa después de hacer registro en ella, contribuían a pagar un sereno del comercio para ·que vigilase de noche sus establecimientos, vigilancia que también hacía un policía insular, probaron que la casa tenía instala- ·ciones eléctricas en los departamentos ocupados por ellos; que ·en Caguas habían ocurrido algunos incendios en otras casas ·producidos por las instalaciones eléctricas; que J. Muñoz y Cía. había quitado un depósito que había tenido para la venta de gasolina porque así se lo ordenó el dueño de la casa si no aseguraba ·ésta contra incendio, y que si bien tenía en su pulpería algunas cajas con latas de petróleo la venta de este artículo formaba ·parte de su negocio de pulpería. En vista de esta prueba no contradicha opinamos que los demandados probaron que el incendio productor del deterioro de la casa ocurrió sin culpa suya, por lo que no están obligados los demandados al pago de las repara- ·ciones de la casa."

lidad procedente de negligencia pueda moderarse por los Tribunales según los casos (art. 1.103). En conjunto significa este sistema un progreso, por la flexibilidad con que permite adaptar la idea de la culpa a cada especie ·concreta." Derecho Civil Español, Común y Foral. Tomo 3, 8va. ed., pág. 146. En parecida forma se pronuncia Puig Peña, obra citada, págs. 245, :253, comentando sobre la vieja teoría romanista de la graduabilidad y prestación de la culpa: "Después del Código, sólo se debe prestar aquella dili- ·gencia que exija la naturaleza de la obligación, no en si misma, sino teniendo en cuenta las circunstancias de las personas, tiempo y lugar. Solamente a título supletorio, es decir, cuando de la obligación nada se desprenda o ésta nada diga, exigirá la diligencia que corresponda a un buen padre de familia, que representa el tipo medio de diligencia normal (art. 1104, párrafo 2.º). En cada caso, pues, los Tribunales serán los llamados a decidir cuál era la diligencia que se debía haber empleado, y si por no prestarla el ·deudor ha incurrido en culpa". Y véase Manresa, Tomo VIII, Vol. 1, ·5ta. ed., pág. 192 *et seq.*

En *Del Valle* v. *M. González y Cía.*, 39 D.P.R. 820 (1929), la responsabilidad de la arrendataria fue sostenida por el incendio del edificio arrendado, pero la decisión descansó no tanto en el hecho de si ésta había logrado o no destruir la presunción de culpa, como en el hecho de que el tribunal inferior declaró probado afirmativamente que el incendio había ocurrido debido a la negligencia de empleados de la demandada.

En *Ruiz* v. *Umpierre*, 49 D.P.R. 270 (1935) se sostuvo la responsabilidad del arrendatario por el incendio ocurrido en una casa-residencia cuando la ocupaba y vivía un hijo de éste, aunque el contrato prohibía el subarriendo de la propiedad. Una lectura del resumen detallado de la prueba del demandado que aparece en la página 273 de la opinión, nos produce cierta duda si a la luz de la evaluación que hicimos en el caso de *Ramírez Muñoz*, supra, el demandado no llegó a probar también que el incendio había sido sin su culpa. La propia opinión refleja esa duda al expresar que no estábamos del todo convencidos de que el demandado no tenía un caso debatible, y lo exoneramos de la condena en costas. Quizás pesó en el ánimo del Tribunal el hecho de que el demandado había entregado la casa a un hijo y que por lo menos en otra ocasión la había subarrendado a una persona que a su vez permitió a otros que la ocuparan para fines no compatibles con el debido cuidado, y además que no ofreció prueba, después de haberse hallado debajo de la escalera dos días antes una lata que echaba humo cubierta con un pedazo de saco, que se hiciera algo para cuidar la casa en forma especial.

Finalmente, en *Costa* v. *Waldrop Photographic Co.*, 54 D.P.R. 80 (1939) se arrendó a la demandada un edificio en San Juan bajo cláusulas en escritura pública que estipulaban que la arrendataria no podría introducir en la casa materias inflamables ni explosivas. La arrendataria subarrendó el zaguán y el primer piso de la propiedad a un tercero imponiéndole la prohibición de introducir materias inflamables o explosivas. Hubo una explosión y se desarrolló un incendio en la parte subarrendada causando daños considerables a todo

el edificio. Se declaró sin lugar la demanda y se levantó como error ante nos el que se concluyera que la demandada no tuvo culpa ni fue negligente, y que había actuado diligentemente como un buen padre de familia simplemente por haber prohibido al subarrendatario introducir en la casa materias inflamables y explosivas; y porque la demandada no adujo evidencia alguna para destruir la presunción de culpabilidad establecida en los arts. 1137 y otros del Código Civil. Se estipuló que había ocurrido una explosión seguida de un incendio como resultado de la existencia de varios paquetes de petardos que el subarrendatario había almacenado en el piso que le fue subarrendado. Considerando el punto de que la arrendataria no había controvertido la presunción de ley en cuanto a su culpa, dijimos:

"Puede asumirse con bastante seguridad que la demandada no tomó parte activa en la introducción de los explosivos. El mero hecho de que su introducción ocurriese en la parte subarrendada del edificio tendería a sostener dicha conclusión. Después de un análisis de las circunstancias, estamos inclinados a sostener la decisión de la corte de distrito. El razonamiento necesariamente partiría del hecho de que la Waldrop Photographic Co. se había obligado a sí misma a no introducir materias inflamables dentro del edificio. No hay evidencia alguna de que su negocio fuese de tal naturaleza que levantase la probabilidad de dicha introducción, ni de que hubiese razón alguna para creer que dicha demandada hubiese en alguna ocasión violado directamente dicha cláusula. Consistente con la restricción convenida y consciente de su sentido de responsabilidad bajo dicha restricción, la demandada introdujo la misma prohibición en el contrato de subarrendamiento. Posteriormente surgió el fuego y hubo una negación expresa de conocimiento o responsabilidad en cuanto a su origen o efectos. Esto puede verse del acta de requerimiento solicitando reparaciones que aparece de los autos. Es sumamente difícil probar un estado de hechos negativo y mucho más cuando dicha prueba es requerida en cuanto a un estado mental. Por eso queremos decir que la demandada no podía hacer mucho más, en caso de poder hacer algo, que negar conocimiento de los hechos."

Para determinar, a la luz de esos precedentes y de la doc-trina aplicable, si la demandada probó o no estar exenta de culpa por la ocurrencia del incendio, es necesario exponer una serie de hechos adicionales y circunstancias que aparecen del récord que la Sala sentenciadora no mencionó en sus conclu-siones. La prueba de la demandante demostró que Rafael Arcelay y Francisco Rodríguez construyeron en sociedad el teatro en el año 1935 y ya entonces prepararon un local o anexo de unos diez pies de ancho por quince pies de fondo a la entrada en el vestíbulo para ser usado por Rodríguez como cantina o fuente de soda. Rodríguez explotó el negocio un tiempo y luego lo arrendó a otro. En 29 de mayo de 1936 Arcelay acompañado de su esposa la aquí demandante y Ro-dríguez arrendaron el teatro, incluyendo el local de la cantina en poder de un tercero, a Rafael Ramos Cobián, por el término de seis años y prórroga de cuatro, quedando el arrendatario autorizado para subarrendar. Rafael Ramos Cobián, Presi-dente de la demandada, declaró que desde un principio hubo en dicha cantina una estufa o cocina de gas y otro aparato de calentar, y el negocio era muy conocido por la confección de pastelillos que todos procuraban; al clausurar el teatro en noviembre de 1947 la cantina quedó funcionando porque no formaba parte del teatro, estaba unida al edificio pero sobre-salía del mismo como cosa independiente. Declaró que des-pués de haberlo cerrado le informaron que había salido humo del teatro y que fueron los bomberos y al día siguiente pasó orden de que quitaran todos los fusibles de la instalación y se desconectara la corriente; se enteró que no se debió a la co-rriente y sí a que alguien se quedó dormido dentro fumando y se habían quemado unos periódicos, y ordenó que clausuraran todas las puertas y notificó a la policía. No tenía allí pelí-culas. Guardaba libros en un local que usaba como oficina. Había extinguidores en buenas condiciones inspeccionados cada año por los bomberos. Cerró el teatro Rex en noviembre de 1947 después de estar funcionando otro que construyó allí

cerca, debido a las condiciones de inseguridad en que estaba para el público según los informes de los bomberos y del Departamento de Salud; después de clausurado visitó dos o tres veces el local, siendo la última vez unos tres meses antes del incendio; no dejó allí un guardián, pero un conserje del otro teatro iba a inspeccionar el sitio y a limpiarlo, y los demás empleados iban a cada rato. Le pidió al dueño de la cantina que era Capitán de la Policía, que ésta vigilara el teatro.

El testigo Humberto Rodríguez Pardo declaró que la cantina la operaba uno de los dueños del teatro al ser construido, que subarrendó la misma en 1940 y mantuvo el negocio de venta de café, pastelillos, refrescos, etc., hasta enero de 1948 que vendió el negocio a José Cedeño; había una barra al frente y unos cristales sobre una pared de concreto de 6 pies de alto y se veía donde se preparaban los pastelillos; la estufa era de gas (kerosina) y estaba sobre una base de concreto entre dos paredes también de concreto. Paraba de cocinar como a las 10:30 P. M. y antes de cerrar quitaba los "candungos" de gas y se ponían aparte para ver si estaba bien apagada la cocina. Los bomberos inspeccionaban el negocio mensualmente y no recibió quejas de ellos. Como a las dos semanas de cerrado el teatro un empleado de Cobián encargado de la propiedad sacó los fusibles. Hubo dos conatos de fuego, uno antes de clausurarse el teatro debido a cigarrillos que tiraban sobre el techo y otro cuando se quemaron unos papeles después de cerrado. Eduardo Regal dijo ser el encargado de las propiedades de la demandada; poco después de cerrado el Rex le quitó los fusibles al edificio para que no hubiera corriente eléctrica y condenó todas las puertas excepto una para permitir la limpieza; los extinguidores estaban en sus sitios y así lo exigían los bomberos; el conserje del otro teatro cercano hacía la limpieza del local periódicamente y el testigo iba con frecuencia a inspeccionarlo. Condenó más fuertemente las puertas después que encontró unos papeles quemados. Pudo haber estado en el edificio tres días o una

semana antes del fuego. Sabía que había una estufa en la cantina de gas de tanque, y que preparaban café. Iba a cobrarle el alquiler a Rodríguez Pardo y desde el mostrador veía la cocina.

La interventora presentó como prueba de refutación, primer testigo que oyó el Juez sentenciador, la declaración de Francisco Castillo. Dijo ser vigilante de comercio en el sector del Teatro Rex, alrededor de la una sintió un golpe dentro de la cantina como una cosa que caía, vio una claridad y otra persona descerrajó la puerta y vieron fuego en una estiba de cajas de cerveza que había pegada en la cocina. Vio allí botellas de gas flúido y una estufa recostada sobre la estiba de lado. Se pusieron en movimiento y los guardias avisaron a los bomberos. La cantina era una pieza aparte del teatro. La demandada presentó en contrarrefutación el testimonio de José A. Cedeño, Capitán de la Policía, que operaba la cantina al ocurrir el fuego. Dijo que vendía refrescos y pastelillos y había descontinuado las comidas y que la estufa no tenía gas en los tanques. Pagaba el alquiler por correo y nadie iba personalmente a cobrarle. Cobián fue algunas veces a la cantina después de cerrado el teatro. Le avisaron del fuego en su casa y al llegar prácticamente estaba extinguido. La interventora ofreció el testimonio del detective Carlos A. Rodríguez, al efecto de que en mayo de 1949 se vendía allí comidas a la sartén y mariscos.

Además de la anterior prueba reseñada, el récord demuestra que la demandante adquirió la propiedad en liquidación de gananciales en 7 de enero de 1942 y tenía conocimiento de que allí había una cantina. En 25 de julio de 1947 ella arrendó el teatro a la demandada Cobián Theatres representada por su presidente Rafael Ramos Cobián incluyendo el local de la cantina, en ese entonces en posesión de Humberto Rodríguez Pardo como subarrendatario, por el término de 10 años a partir del 1ro. de agosto de 1947. Se autorizó a la demandada a subarrendar libremente la propiedad. Tres meses después,

en 27 de noviembre de 1947 se clausuró el teatro. La cantina en poder del subarrendatario, aunque unida al edificio, formaba cuerpo independiente y quedó funcionando.

 Sostiene la apelante que en descargo de su responsabilidad a ella sólo incumbía demostrar que usó la cosa como un diligente padre de familia, y que eso era a lo que venía obligada según el art. 1445(2). Discuten por el contrario las apeladas que para su descargo no le bastaba con probar tal cosa,—lo cual sería a lo sumo un factor a considerarse al determinar el *grado* de responsabilidad,—sino que ella venía obligada a probar afirmativamente que la pérdida se debió a un caso fortuito, y descansan en el deber del arrendatario, de acuerdo con el art. 1451, de devolver la cosa tal como la recibió salvo lo perecido por causa inevitable. Estas dos obligaciones, la de usar de la cosa con la diligencia de un buen padre de familia y la de devolverla como la tomó salvo lo perecido por causa inevitable, no están ni en el campo de la realidad de los hechos ni en la esfera doctrinal tan desvinculadas una de la otra como las presentan los litigantes, particularmente la parte apelada. Cuando la responsabilidad final ha de producirse, el propio Código las ordena en el área común de la culpa.

Causa *inevitable* que releva de la obligación de devolver la propiedad en el estado en que se entregó, como dice Manresa—Tomo 10, 5ta. ed., pág. 601—y está aceptado, es el caso *fortuito*. Pero seguido apunta el tratadista que ese artículo "no hace más que aplicar la doctrina general de las obligaciones," y señala al art. 1105 (1058 nuestro) en que nadie responderá de aquellos sucesos que no hubieran podido preverse, o que previstos, fueran inevitables, y al art. 1182 (1136 nuestro) sobre la extinción de la obligación de entregar una cosa cuando se perdiere sin culpa del deudor. Y en cuanto a la obligación de usar la cosa como un diligente padre de familia, observa Manresa, *op ct.*, pág. 555, que el arrendatario tiene a su disposición una cosa ajena "y es *deudor* de ella, en rigor,

puesto que ha de *restituirla* a la terminación del arrendamiento" (énfasis adicionado) ; y que "en este concepto" sin que el Código dijese nada en el artículo comentado (1445(2) nuestro) "estaría sujeto al precepto del artículo 1.104 [1057] que dice que la culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar, y que cuando la obligación no exprese la diligencia que ha de prestarse en su cumplimiento, se exigirá la que correspondería a un buen padre de familia. Pero el Código ha hecho constar expresamente en este lugar la diligencia del padre de familia; es decir, la diligencia tipo, como obligatoria para el arrendatario, para dar a entender que la ha de observar no ya tan sólo en cuanto es deudor de ella, sino en los actos de su uso, o, lo que es lo mismo, como tal arrendatario."

Es claro que al determinarse la responsabilidad del arrendatario como deudor de la cosa por su pérdida o deterioro, no puede hacerse abstracción absoluta del concepto de la diligencia que aquél debió haber observado en el uso de la misma, sobre todo, que el art. 1453 sitúa tal responsabilidad en la culpa de aquél, y si se tiene en cuenta, además, lo dispuesto en el art. 1057. Como agente liberador o extinguidor de las obligaciones, el caso fortuito en el concepto positivo es aquel suceso que no hubiera podido preverse, o que previsto, fuera inevitable, según reza el art. 1058 del Código Civil. 31 L.P.R.A. sec. 3022. Una tendencia más moderna que recoge Don José Castán por razones que explica y siguen muchos tratadistas, tiende a definir el caso fortuito que libera de la responsabilidad más simplemente por vía de exclusión, y como lo llama el propio Castán "con fórmula negativa". Así nos dice que el caso fortuito tiene como su aplicación más importante la de ser causa de irresponsabilidad en el incumplimiento de las obligaciones, y que "en este sentido puede definirse (con fórmula negativa) como aquel accidente no imputable al deu-

dor que impide el exacto cumplimiento de la obligación", aunque luego lo define también con los elementos positivos del art. 1058 "como el acontecimiento no imputable al deudor, imprevisto, o previsto pero inevitable" que imposibilita el cumplimiento. (⁷)

Puig Peña, después de exponer que tradicionalmente se entiende la responsabilidad como una consecuencia de la culpabilidad, y que para declarar a una persona responsable de determinado evento es absolutamente necesario ponerlo en relación con los principios generales que dominan la culpabilidad, refiriéndose al *"casus"* nos dice que "lo anteriormente expuesto demuestra que el criterio exacto y correcto para

---

(⁷) Derecho Civil Español Común y Foral, Tomo 3, 8va. ed., págs. 152–153. Castán explica:

"El concepto del caso fortuito integrado por estos elementos positivos, ha tenido gran preponderancia histórica, condensado en la célebre definición de Vinnio: *'omme quod humano captu praevidere non potest nec cui praeviso potest resistit'* (1). Su sentido ha pasado a muchos Códigos modernos y, entre ellos, como acabamos de ver, al nuestro.

"Un gran sector de la doctrina moderna ha impugnado ese concepto tradicional, aduciendo que dada la variabilidad de la noción del caso fortuito, por la relación íntima que tiene que guardar con el grado de diligencia que debe prestar el deudor en cada relación concreta, no es posible dar una definición positiva del caso fortuito, sino sólo un concepto negativo o por exclusión, como hecho no atribuible a culpa del deudor, que hace imposible el cumplimiento de la obligación (2).

"Pero buen número de autores, como Giorgi, vuelven a la concepción subjetiva tradicional, estimando que ella es la única que cierra la puerta a la confusión de la culpa excusable con el caso fortuito y la que responde al sentido de los Códigos inspirados en el Derecho romano (3).

"El Código alemán sigue el criterio nuevo: no define el caso fortuito ni habla especialmente de él y lo identifica con la imposibilidad de realizar la prestación (véase su § 275).

"El Código español está fundamentalmente influido por la concepción tradicional; pero en realidad no adopta un criterio muy claro frente al concepto de que se trata. El art. 1.105 responde a la tesis positiva; mas el art. 1.182, lo mismo que los arts. 1.122 y 1.147, parecen obedecer a la tesis negativa. Valverde estima, sin vacilación, que nuestro Código acepta el concepto clásico de caso fortuito. Díaz Pairó (4) estima, en principio, que debe darse preferencia a la noción negativa del caso fortuito; pero a continuación propone una solución conciliadora. Puig Peña (1) no se aventura a desprenderse en absoluto de la fórmula tradicional y nos dice que la tesis positiva del art. 1.105 es la más invocada en nuestra doctrina y en la jurisprudencia."

definir el caso fortuito es el *negativo o per exclusionem* defi-niéndosele como todo acontecimiento no imputable de ningún modo a la persona obligada." [8]

Por lo menos en lo que respecta al caso de incendio de la propiedad arrendada, hemos seguido la fórmula de exclusión en la consideración del caso fortuito. Nuestras decisiones anteriores no impusieron al arrendatario la obligación de probar afirmativamente la causa fortuita del fuego, sólo le exigimos que probara su falta de culpa en el evento. No otra podría ser la doctrina nuestra pues si bien el art. 1451 declara la obligación del arrendatario de devolver la propiedad des-pués de usarla en el estado en que la tomó salvo lo perecido o deteriorado por causa inevitable, que es decir caso fortuito, cuando de su responsabilidad se trata por la pérdida efectiva-mente acaecida de la cosa, el Código lo exonera si prueba que se ocasionó sin culpa suya, según dispone el art. 1453, y por referencia del 1458, el art. 1136. Al presumir el 1137 la culpa del arrendatario y no el caso fortuito, arroja sobre aquél la carga o peso de probar la inexistencia de su culpa, pero no le obliga, como afirmativamente le requiere el Código francés en su art. 1733, [9] a probar la causa fortuita—hecho que no pudo prevenir o previsto era inevitable—del incendio.

Fue por tanto errónea, como cuestión de derecho, la con-clusión de la Sala sentenciadora de que corresponde al arren-datario probar que el incendio se debió a un hecho fortuito y

---

[8] Tratado de Derecho Civil, Tomo IV, Vol. I, págs. 245–246. Discu-tiendo el conflicto de doctrinas en cuanto a cuál era realmente la esencia del caso fortuito, que unos la colocaban en la "imprevisibilidad" y otros en la "inevitabilidad", y las dificultades a que ha dado lugar en los casos concretos, dice Puig Peña que debido a esto gran número de tratadistas se inclinan por la tesis negativa o de exclusión, haciendo relación a la total ausencia de culpabilidad. Al igual que Castán, Puig Peña señala la adopción por nuestro Código de la tesis negativa en el art. 1136, y otros.

[9] El art. 1733 del Código francés adicionado específicamente para el caso de fuego, dispone que el arrendatario es responsable del incendio a menos *que pruebe* que el incendio ha ocurrido por *caso fortuito, o fuerza mayor*, o por un vicio de construcción, o que el fuego haya sido comunicado por una casa vecina. Aun así, comenta Laurent, Derecho Civil Francés,

que si no probare la causa u origen del fuego el arrendatario no descarga su responsabilidad y se le aplicará la presunción de culpa. Esa conclusión es contraria a la doctrina y a los preceptos del Código. El propio Manresa, citado por la Sala en apoyo de dicha conclusión, y quien entre los tratadistas ha seguido el concepto tradicional positivo del caso fortuito—el evento que no podía preverse o que previsto era inevitable—tratando el caso específico del incendio de la cosa arrendada no hace sino la siguiente conclusión del examen de los arts. equivalentes a los 1451, 1453, 1136 y 1137: "Es ineludible la consecuencia de que el arrendatario debe probar, para eximirse la responsabilidad, que *en el hecho del incendio* no ha habido por su parte *culpa ni negligencia.*" La sentencia del Tribunal Supremo de España de 8 de enero de 1929 que también cita la Sala para su conclusión, no es rigurosamente aplicable. Se trataba de mercancía depositada en la aduana que pereció debido a un fuego. Se consideraron además ordenanzas de aduana que exoneraban a ésta del deber de entregar el depósito sólo en caso de fuerza mayor, y se habían alegado por la actora actos específicos de negligencia por parte de la depositaria. Ante el tribunal de instancia el Estado sólo se limitó a probar, presentando el expediente instruido de la investigación, que ignoraba las causas que hubieran podido producir el fuego, y que bien pudieran ser debido a la instalación deficiente del flúido eléctrico para el alumbrado. La Audiencia resolvió que se trataba de un caso fortuito revocando a la

---

Tomo XXV, pág. 333: "Se pregunta que si los hechos enumerados por la ley son los únicos que el arrendatario está admitido a probar. ¿Debe interpretarse en el sentido de que la prueba por rendir del arrendatario consista en establecer que la *pérdida ha tenido lugar sin su culpa?* Estas son las expresiones del art. 1732. Tal es, en nuestro concepto, el sentido del art. 1733; es la opinión de la mayoría de los autores y está consagrada por la jurisprudencia. Pero los motivos para dudar no faltan. Hay más, nosotros no podemos admitir todas las razones que se dan en apoyo de la opinión que enseñamos." (Énfasis del autor.) El art. 1732 a que alude, semejante al 1453 nuestro, dispone que "el arrendatario es responsable de los deterioros que han tenido lugar durante su goce a menos que pruebe que no han pasado por culpa suya."

primera instancia, y la sentencia del Tribunal Supremo, al revocar a la Audiencia, sienta la doctrina que del hecho probado de que se ignora la causa del fuego, no procede en derecho la conclusión afirmativa de que ocurrió por caso fortuito. Las sentencias de 7 de octubre de 1899 y de 26 de marzo de 1928 citadas en la de 8 de enero de 1929 trataban de mercaderías incendiadas en el transporte terrestre, y aplicaron el artículo 361 del Código de Comercio, igual al 279 de la edición de 1932, el cual impone al porteador la obligación *de probar* el caso fortuito o la fuerza mayor. Y véase la sentencia de 12 de junio de 1950 en donde la responsabilidad del arrendatario por el fuego se discute en término de "su culpa".

La prueba demuestra que no se supo la causa específica o agente que produjo el fuego. Como observamos en el caso de *Waldrop, supra,* es sumamente difícil probar un estado de hechos negativo, sobre todo que el incendio no está considerado por sí mismo caso fortuito y entra en juego la conducta humana. Al decidir en este caso en particular cuál era la diligencia procedente o que debió emplearse o si por no prestarla la demandada incurrió en culpa, según la diligencia exigida por la naturaleza de la obligación, hay que considerar la que corresponde a las circunstancias de las personas, del tiempo y del lugar que surgen de la anterior prueba no controvertida —artículo 1057—y que aparentemente no fueron tomadas en cuenta por la Sala sentenciadora. Está el hecho que al construir el teatro con su esposo la propia demandante ya hizo destinar una parte del edificio como local para que se explotara un negocio que requería allí los medios de confeccionar alimentos para el público; que tanto Cobián individualmente en 1936 como la demandada en 1947 al arrendar el teatro se encontraron con personas en posesión de este local como subarrendatarios operando ese tipo de negocio, siendo en consecuencia la presencia de una estufa o cocina con el combustible necesario para usarse un hecho ordinario o normal, y no

inusitado; que durante trece años se cocinó en ese sitio sin ocurrir por esta actividad ningún amago de incendio y los bomberos inspeccionaban el negocio y no dieron quejas; la condición del local que permitía ver la cocina desde cualquier sitio del mismo, y el hecho también que al cesar Rodríguez Pardo en la posesión la persona que la demandada escogió o toleró como subarrendatario era un alto oficial de la Policía en quien pudo razonablemente confiar, por la posición que ocupaba, como persona responsable y cuidadosa conocedora de los riesgos de incendio. Bajo estos hechos y circunstancias la diligencia prestada por la demandada de inspección periódica y cuido en general de la propiedad era normalmente la procedente.

Apreciada esa prueba([10]) a la luz de nuestras decisiones citadas, de la doctrina y de los preceptos aplicables del Código, hay que concluir que no hubo la omisión por parte de la demandada,—artículo 1057—de aquella diligencia que exigía la naturaleza de la obligación (culpa leve del padre de familia, artículo 1445(2), "tipo medio o normal de persona diligente") correspondiendo a las circunstancias de personas, tiempo y lugar que la prueba señala.

*Por los fundamentos anteriormente expresados se revoca la sentencia recurrida, y se dictará otra declarando sin lugar las demandas, con imposición de costas a las partes demandantes, sin honorarios de abogado.*

Los Jueces Presidente Sr. Negrón Fernández y Asociados Sres. Pérez Pimentel y Saldaña, no intervinieron.

---

([10]) Estamos en iguales condiciones que la Sala sentenciadora para apreciar o pesar la prueba, ya que el caso se le sometió por el récord, y en cuanto al breve testimonio oral que desfiló ante ella, se acepta la forma en que dirimió el único conflicto surgido con la declaración de Cedeño al efecto de que ya había descontinuado el servicio de comidas.