CONCHITA DE GOENAGA, demandante, recurrente y recurrida, *v*. WEST INDIES TRADING CORPORATION y MIGUEL FRANCISCO, demandados, recurrente la primera y recurrido el segundo.

*Números*: 10142, 10244          *Resueltos*: 28 de junio de 1963

*F. Fernández Cuyar,* abogado de la recurrente y recurrida; *Benjamín Ortiz,* abogado del recurrido; *Brown, Newson & Córdova,* abogados de la recurrida y recurrente.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ PRESIDENTE SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del Tribunal.

Miguel Francisco era dueño de un edificio de concreto, de dos plantas y sótano, con garaje, conocido como Edificio Rosales, situado en la intersección de las Avenidas Fernández Juncos y Ponce de León, en Martín Peña, Santurce. Lo había tenido cedido en arrendamiento a Conchita de Goenaga por la suma de $200 mensuales, por un período de cinco años, término éste que venció el 1ro de diciembre de 1944. Goenaga tenía establecido en el mismo un negocio de fabrica-

ción de trajes de mujer y niños. Al vencimiento de dicho contrato, Francisco se negó a prorrogarlo, consintiendo tan sólo en continuar el arrendamiento del segundo piso y parte del primero, de mes a mes, por el mismo canon de $200 mensuales que había venido pagando Goenaga por todo el edificio, a fin de arrendar la parte restante del primer piso y el sótano a West Indies Trading Corporation—de ahora en adelante West Indies. Ésta habría de dedicarlo al establecimiento de una fábrica para la elaboración de cigarros y tabaco, en la fumigación del cual utilizaría bisulfuro de carbono. El arrendamiento a West Indies se hizo por la suma de $300 mensuales [1]

---

[1] El contrato entre West Indies y Francisco, otorgado en inglés contenía, entre otras, las siguientes cláusulas:

"SEGUNDA: . . . . . . .

La segunda planta y una pequeña parte del primer piso que está separada por una división, está al presente arrendada a la Sra. Conchita Goenaga de Nido.

TERCERA: El arrendador cede en arrendamiento a la arrendadora, o sea, la West Indies Trading Corporation aquella parte del primer piso que no está arrendada a la Sra. Conchita Goenaga de Nido, el sótano del edificio y el garage de dos plantas, anteriormente descritos, sujeto a los siguientes términos y condiciones; a saber:

(a) El arrendamiento se hace por término o período indefinido; dicho término o período no será menor de un mes, y podrá ser terminado a voluntad tanto por el arrendador como por la arrendataria a fines de cualquier mes.

(b) El término del arrendamiento comenzará el 26 de diciembre de 1944 y cada mes se contará del 26 de un mes al 25 del mes siguiente, y así sucesivamente, hasta que medie notificación indicando la fecha en que el arrendamiento habrá de terminar.

(c) Dicha notificación se dará con un mes de anticipación.

(c) El canon mensual de la propiedad arrendada será de TRESCIENTOS DÓLARES ($300) pagaderos por adelantado al comienzo de cada mes.

(d) La arrendataria por la presente conviene en tomar posesión de la propiedad arrendada en las condiciones que la misma está en la actualidad y en que ella la entra; pagará los gastos de agua, luz y gas y los de cualesquiera reparaciones necesarias, y conservará la propiedad, y a la terminación del arrendamiento la dejará en condiciones que no sean peores que aquellas en que la recibe.

(e) El arrendador no será responsable ni responderá por ningún defecto, oculto o de cualquiera otra clase, o imperfección en la propiedad arrendada y no surgirá o procederá reclamación en su contra por ninguna

El 26 de febrero de 1946 hubo un conato de fuego en el sótano del edificio, ocupado por West Indies. Goenaga notificó a su arrendador de ese hecho. (²) El 8 de junio siguiente ocurrió una explosión en dicho sótano, seguida de un fuego que destruyó totalmente el edificio—y el negocio de Goenaga—dejando en pie tan sólo las paredes exteriores y alguna que otra viga interior.

Goenaga instó pleito en reclamación de los daños y perjuicios sufridos como consecuencia de dicho incendio, obteniendo sentencia contra West Indies por la suma de $132,404.79 más las costas y $10,000 para honorarios de abogado. Miguel Francisco fue exonerado de responsabilidad. De la sentencia en su

---

lesión, daños o inconveniencias que surjan o sean causadas por el inquilino, lo mismo por los elementos que por acción del hombre, y el arrendatario por la presente renuncia a todo derecho a reclamación, causa de acción o demanda para recobrar por cualesquiera daños, lesiones o inconveniencias que surjan de defectos o imperfecciones en la propiedad arrendada por cualquier causa, quedando para siempre relevado el arrendador de toda responsabilidad por tal concepto."

(²) Ese mismo día Goenaga remitió a Francisco, por correo especial certificado, la siguiente carta:

"Estimado señor Francisco:

Hoy hubo fuego en la West Indies Trading Corp. a quien usted le tiene alquilado el primer piso, sótano y garages de este edificio. En el corto tiempo que esta gente está ocupando este edificio hoy es la segunda vez que hay fuego, que aparte de haberse podido pasar para mi taller de costuras y haberme ocasionado irreparables pérdidas me ha ocasionado desorganización y trastornos que afectan el mismo.

Como usted comprenderá es imposible que esto siga ocurriendo pues un fuego que destruya mi taller de costuras me privaría a mi del negocio por mucho tiempo pues lo que pudiera yo recobrar por aseguro no recompensaría la pérdida del negocio que significaría una catástrofe de esta índole. Usted comprenderá que este edificio no reúne las propiedades para tener en el mismo un negocio de la índole de la West Indies Trading Corp. que al mismo tiempo proteja de fuego al otro inquilino del edificio que en este caso soy yo que ocupo los altos.

Espero que usted le dé atención inmediata a este asunto ya que yo no estoy dispuesta a perder mi negocio ni que el mismo sea perjudicado por causas de las cuales no soy culpable.

En espera de noticias suyas, quedo

Muy atentamente,<br>Conchita G. de Nido"

contra recurrió West Indies a este Tribunal y Goenaga de aquella parte que exoneró a Francisco. ([3])

En su demanda Goenaga imputó negligencia a West Indies, consistente en mantener almacenadas en el local o locales por ella arrendados en dicho edificio y utilizar continuamente en su establecimiento cantidades considerables de material inflamable y explosivo en violación de las leyes y reglamentos aplicables. Imputó igualmente negligencia concurrente al codemandado Francisco, consistente en haber arrendado el local a West Indies a sabiendas de que ésta dedicaría el mismo al establecimiento de una fábrica para elaborar tabaco en la cual utilizaría, entre otras, materiales sumamente inflamables y explosivos, y en permitir que continuara dicho arrendamiento y la dedicación de la parte del edificio arrendada a West Indies para tal propósito, sin tomar dicho codemandado medida alguna para prevenir una catástrofe, no obstante haber sido notificado por la demandante de explosiones y conatos de fuego ocurridos anteriormente.

West Indies, después de admitir unos y negar otros de los hechos de la demanda, interpuso como defensas especiales (1) que el incendio ocurrido el 8 de junio de 1946 fue uno accidental y casual, cuyas causas u origen le eran desconocidas, no habiendo tenido dicho incendio como su causa próxima o directa negligencia alguna que pudiere serle imputada, habiendo ejercido en su negocio siempre el cuidado de un buen padre de familia; (2) que en el supuesto de que el incendio hubiere ocurrido debido a la ignición de los gases del bisulfuro de carbono que la demandada utilizaba para la fumigación de sus productos, ésta ejerció siempre todas las medidas de cuidado recomendadas y reconocidas para el caso y la demandante tenía conocimiento del uso de dichas substancias quí-

---

([3]) Estos recursos pasaron a este ponente con posterioridad a la fecha en que fueron sometidos y turnados al ponente original. El récord elevado consta de 7,502 páginas, que incluyen 352 páginas de Legajos de Sentencia, 1,981 de transcripción de prueba oral y documental y otras 4,721 de evidencia documental en originales, y 448 páginas de alegatos en español e inglés.

micas para los fines indicados y voluntariamente asumió todos los riesgos consiguientes al uso de dichas substancias, y (3) que la demandante recibió $16,837.08 y $5,000 por pago de seguro de mercancía y mobiliario destruida en el incendio.

Por su parte el codemandado Francisco, luego de también aceptar unos y negar otros de los hechos de la demanda, interpuso como defensas especiales (1) que aun asumiendo que West Indies hubiera sido negligente, Francisco no lo fue y que cualquier posible negligencia de West Indies no le era imputable a él; (2) Que los artículos o materiales usados y almacenados por West Indies en el local ocupado por ésta no eran a la fecha del incendio, ni antes, inherentemente inflamables o peligrosos o explosivos por sí y que Francisco no tenía conocimiento alguno de que lo fueran; (3) Que toda posible negligencia de West Indies se debió exclusivamente a que ésta no tomó las debidas precauciones y no actuó con el debido cuidado en el uso de dichos materiales y artículos, todo ello sin conocimiento de Francisco, sin que éste hubiere sido responsable de dicha negligencia y (4) Que West Indies tenía a la fecha del incendio el control absoluto y exclusivo del local en que se originó el mismo, siendo West Indies la única que conocía o podía conocer la forma específica en que se originó dicho incendio, no así Francisco; y que en vista de la forma en que ocurrió el incendio éste tuvo que haberse producido solamente por la negligencia o a una actuación intencional de West Indies en cuya negligencia o actos no intervino Francisco y por los cuales no es responsable ni le pueden ser imputados.

Luego de una serie de interrogatorios, contestaciones a éstos, examen de documentos y práctica de extensa prueba oral y documental, relativa principalmente al extremo de la responsabilidad, y de seguirse el trámite que por estipulación de las partes se dispuso para la presentación de la prueba relativa a los daños, se dictó la sentencia a que ya nos referimos y que dio origen a los recursos que aquí nos ocupan.

Antes de entrar a considerar las cuestiones planteadas en los extensos alegatos sometidos por las partes, es indispensable referirnos primero a los hechos esenciales surgentes de la voluminosa prueba practicada sobre responsabilidad, según las conclusiones a que llegó el tribunal sentenciador a ese respecto —sin repetir aquellos a que se hace referencia breve al comienzo de esta Opinión—para pasar a examinar, a la luz de esos hechos y los planteamientos en cada recurso, la responsabilidad civil de los demandados y luego, haciendo lo propio, examinar la cuestión relativa a los daños.

## Las Conclusiones de Hecho

### (Responsabilidad)

"West Indies instaló en el sótano del edificio una planta de fumigación de tabaco que consistía de dos cuartos para la fumigación en los cuales se introducía el tabaco, se ponía bisulfuro de carbono en forma líquida, y se cerraban herméticamente. Al convertirse el bisulfuro en gas, destruía los insectos que infestan el tabaco. Al terminarse el proceso de fumigación, o antes si se necesitaba urgentemente el tabaco para embarques, los cuartos de fumigación se abrían y se extraía el tabaco para ser empacado y embarcado. Debido a la gran concentración de gas de bisulfuro que había corrientemente en los cuartos de fumigación, al abrirse éstos el resto del sótano se inundaba de gas, haciendo casi imposible estar allí. Los trabajadores que laboraban en estas faenas tenían a veces que usar caretas protectoras contra el gas, suplidas por West Indies, para poder entrar a los cuartos de fumigación. El gas de bisulfuro penetraba por todas partes y se sentía por las mañanas hasta en el primer piso del edificio. La fumigación del tabaco era un proceso casi continuo, especialmente en las últimas semanas antes de junio 8 de 1946. Los empleados trabajaban turnándose en grupos, durante el día y la noche. Había poca ventilación, especialmente durante las noches porque entonces se cerraban las ventanas.

"West Indies compraba el bisulfuro de carbono en forma líquida, en drones de 550 libras cada uno, y los almacenaba en el garage, salvo que dentro del sótano guardaba continuamente un dron en uso; es decir, el dron del cual se sacaba corrientemente el

bisulfuro para uso inmediato en los fumigadores. El bisulfuro se extraía de este dron por medio de tubos de goma y se echaba en palanganas abiertas las cuales se introducían luego dentro del cuarto de fumigación, dejándose allí hasta su evaporación total, o hasta que se abría el cuarto, antes de terminar la fumigación. Al evaporarse, el bisulfuro se convertía en un gas en extremo volátil y explosivo.

"En el sótano había una instalación eléctrica corriente. Las bombillas para iluminación general colgaban con alambres del techo. Habían conmutadores ('Switches') individuales en cada bombilla, un conmutador general, y otro al pie de la escalera. Dentro de los cuartos de fumigación también habían bombillas corrientes, y en el exterior de dichos cuartos había un conmutador que controlaba las bombillas interiores, las cuales también podían prenderse y apagarse manualmente. En ninguna parte del sótano ni de los cuartos de fumigación había bombillas o 'switches' o conecciones o instalaciones especiales, de las que se expenden y usan para evitar explosiones que pudieran producirse debido al efecto del calor, o de chispas eléctricas, sobre gases explosivos o inflamables. En contraste, algunas de las bombillas del sótano y de los cuartos de fumigación eran prendidas y apagadas por los empleados de West Indies desenroscándolas manualmente de sus zócalos. A veces esto producía chispas o 'shock' eléctrico a dichos empleados, especialmente cuando estaban muy sudados.

"Alrededor del Edificio Rosales existían las siguientes condiciones: Por su frente, o sea hacia el Sur, pasaba la Avenida Fernández Juncos, por donde transitaban constantemente peatones, vehículos livianos y pesados de todas clases, y ómnibus de servicio público; al Este, o sea por la derecha entrando, había un negocio de fonda o cafetín donde otro inquilino de Francisco, llamado Evaristo Rivera Guadalupe, usaba casi diariamente en su negocio de fonda anafres de carbón encendido, los cuales situaba algo pegados a la pared del sótano por ese lado. Rivera Guadalupe tenía además mesas y sillas para que sus parroquianos o clientes comieran, bebieran y fumaran; al Norte, o sea por detrás del edificio había un espacio pequeño de terreno, separando el sótano de una calle pública que conecta la Avenida Fernández Juncos con la Avenida Ponce de León en ese sitio, en cuyo espacio Víctor Luciano Colón tenía establecido un negocio de vulcanización de gomas y tubos de automóvil, en el cual usaban ciertas 'planchas' calentadas con gas líquido al que

prendía fuego con fósforos, saliendo entonces llamas y chispas de las planchas hasta que éstas se calentaban lo suficiente para derretir la goma; y al Oeste, o sea a la izquierda entrando, el edificio tenía una entrada para automóviles o camiones que conducía hasta el garaje utilizado para almacenar el bisulfuro de carbono que no estaba en uso.

"Dentro del edificio las condiciones eran las siguientes: La mitad del edificio estaba ocupado por el negocio de West Indies, y la otra mitad, o sea la parte superior, estaba ocupada por la fábrica de la demandante, en la cual se empleaban de 75 a 90 mujeres en trabajos de costura, elaboración de ropas y telas, y empaque y embarque de productos terminados.

"El bisulfuro de carbono y el gas de bisulfuro son materias sumamente inflamables y explosivas. Sus vapores o gases pueden ser explotados por chispas, fricción, llamas o destellos de fuego. No es inherentemente explosivo. En suficiente concentración, el gas de bisulfuro puede ocasionar una explosión tan solo con el destello que produce una bombilla eléctrica de tipo corriente. Dicho gas es en extremo volátil, siendo casi imposible evitar que se escape aún de un espacio completamente cerrado. Por tal razón se considera que las operaciones de fumigación con gas de bisulfuro constituyen un peligro latente a menos que se tomen las debidas precauciones y cuidado.

"West Indies no solicitó ni obtuvo nunca licencia alguna del Gobierno de la Capital, ni del Gobierno Insular, ni del Gobierno Federal, para almacenar y usar explosivos algunos.

"El día 26 de febrero de 1946, temprano en la mañana, ocurrió un conato de fuego dentro del sótano usado por West Indies. Era tan espeso y asfixiante el humo que los bomberos, llamados apresuradamente al afecto, tuvieron que recurrir a caretas para poder penetrar en el sótano. Allí había varias cajas en llamas, las cuales fueron apagadas al cabo de un cuarto de hora. Con motivo de este conato y del mucho humo que se produjo, todos los empleados de West Indies y los de la fábrica de la demandante rápidamente salieron alarmados del edificio. Las pérdidas sufridas por West Indies con motivo de este conato montaron a $234.25, según su reclamación a la aseguradora, Hanover Fire Insurance Company. Dicha suma le fue satisfecha a West Indies por la referida compañía de seguros, pero casi inmediatamente después la póliza le fue cancelada a West Indies, antes de su vencimiento normal.

"Con motivo de este conato la demandante se dirigió por escrito al Sr. Francisco, a su corredor de seguros, Sr. Alberto Ortiz Toro, y al Jefe del Servicio Insular de Bomberos, informándoles de la ocurrencia y llamándole la atención al Jefe del Servicio Insular de Bombero hacia el peligro o riesgo constante que el uso de cualquier líquido inflamable implicaba para la seguridad de todos los ocupantes del edificio y del negocio de la demandante. Además comisionó a su abogado, Lcdo. Carlos J. Torres, para que se entrevistara con el jefe de West Indies, Sr. Allan B. Block, y le pidiera tomar adecuadas precauciones, gestión ésta que llevó a cabo el Lcdo. Torres, contestándole el Sr. Block que él hacía bien las cosas en su negocio. El demandado Sr. Francisco contestó a la demandante indicándole que existían dos maneras de protegerse contra la negligencia de West Indies, a saber, asegurando la propiedad de la demandante en cantidad suficiente para resarcirse de cualquier pérdida en caso de siniestro, o dejar que otro inquilino corriese el riesgo después que la demandante abandonase su local, terminando el Sr. Francisco su carta con el consejo de que si la demandante temía la negligencia del vecino de abajo, debería ponerse a distancia conveniente del sitio de peligro. No obstante dicha carta, don Miguel Francisco visitó el Edificio y habló con el Sr. Arturo Martín García, funcionario de la West Indies, quien le dijo al mostrarle la carta de doña Conchita, que allí no se usaba nada peligroso o que envolviera peligro alguno de fuego, explicándole que el bisulfuro de carbono se usaba en todas las fábricas de la industria del tabaco. En cuanto a la carta dirigida por la demandante al Jefe del Servicio Insular de Bomberos, no hubo contestación alguna a la misma.

"Cuatro meses después del conato ocurrió en el sótano del edificio, en junio 8 de 1946, como a las siete de la noche, una enorme explosión inmediatamente seguida de un fuego que destruyó totalmente el edificio, dejando en pie únicamente las ruinas de sus paredes exteriores y alguna que otra viga interior. La explosión ocurrió en el sótanto ocupado por West Indies y sus efectos fueron tan fuertes que hasta las vidrieras del edificio ocupado por el Servicio de Acueductos, que queda al frente del Edificio Rosales en la Avenida Fernández Juncos, fueron rotas. Todos los empleados de West Indies que estaban entonces trabajando tuvieron que tirarse por las ventanas. El fuego duró muchas horas y aún al día siguiente seguían ardiendo los materiales. El incendio era mucho más intenso, al comenzar, en el la-

do derecho del edificio, aunque era bien intenso en todo el edificio. Por efectos del calor que se produjo, aún el edificio del Servicio de Acueductos también cogió fuego en varios sitios.

"La explosión ocurrió casi simultáneamente con el acto de prender un 'switch' eléctrico. Pedro Carrasco Ríos, empleado de West Indies, fue enviado al sótano desde la primera planta por Arturo Martín García, gerente de West Indies, para conseguir una bombilla eléctrica que debía usarse en la primera planta. El sótano estaba obscuro y cuando Carrasco intentó prender el 'switch' al pie de la escalera para dar luz, inmediatamente ocurrió la explosión, y se desarrolló, 'una llama azul de candela' que se convirtió rápidamente en fuego general. La explosión se originó en el sótano, aunque de la evidencia no surge claramente si fue en el fumigador pequeño o en el grande.

"El Sr. Miguel Franciso no tenía control alguno sobre los negocios establecidos en el edificio dado en arrendamiento a la demandante Conchita de Goenaga y a la West Indies Trading Corporation, así como tampoco tenía ingerencia sobre el almacenamiento, preparación, envase de tabaco o cigarrillos, ni intervención o dominio sobre el proceso de fumigación que llevaba a cabo la co-demandada West Indies Trading Corporation.

"Tampoco tenía conocimiento el Sr. Francisco de que la West Indies llevase a cabo fumigación en forma negligente y descuidada, ni que hasta la fecha del fuego, que motiva este litigio, hubiese dejado de tomar todas las precauciones adecuadas en dicho proceso de fumigación.

"Cualquier posible acción u omisión del co-demandado don Miguel Francisco en el caso de autos no fue la causa próxima de la explosión y del incendio ocurridos en este caso.

"También llega la Corte al convencimiento de que el bisulfuro de carbono no constituye un explosivo dentro del significado de ese término bajo la Ley de Explosivos de Puerto Rico, o bajo cualquier concepto legal en cuanto a explosivos.

"Que la West Indies Trading Corporation no venía obligada a obtener licencia o permiso de agencias de los gobiernos Insular, Federal o Municipal de San Juan, para fumigar tabaco o cigarros con bisulfuro de carbono, y que no existe relación causal alguna entre tal omisión y la explosión e incendio que ocurrieron en el caso de autos.

"La prueba no justifica otra interpretación razonable en cuanto a la causa de la explosión y del incendio que motiva este

pleito, que no sea aquella que implica la negligencia de la parte demandada West Indies Trading Corporation en la causación de la explosión y del incendio.

"La Corte no ha dado crédito a la evidencia sometida por la West Indies en el sentido de sugerir que la explosión fue causada por el calor aplicado a la pared del edificio por los anafres de Evaristo Rivera Guadalupe, ya que dicha teoría es altamente improbable."

### Recurso de West Indies

Cuatro son los fundamentos en que descansa West Indies la impugnación de la sentencia dictada en su contra en cuanto al extremo relativo a la responsabilidad. Pasamos seguidamente a examinarlos en el mismo orden en que los apunta en su alegato.

*Primer Punto: "No existe evidencia alguna en este caso que sostenga las siguientes conclusiones del Tribunal sentenciador".*

". . . El sótano estaba obscuro y cuando Carrasco intentó prender el 'switch' al pie de la escalera para dar luz, inmediatamente ocurrió la explosión y se desarrolló 'una llama azul de candela' que se convirtió rápidamente en fuego general."

   .    .    .    .    .    .    .

". . . estando en completa obscuridad el sótano . . ., mandó a un empleado que no trabajaba nunca en fumigación a buscar una bombilla y al intentar ese empleado prender un 'switch' para dar luz al sótano, ocurrió inmediatamente una explosión . . . ."

   .    .    .    .    .    .    .

". . . Habían [*sic*] conmutadores (switches) individuales en cada bombilla, un conmutador general y otro al pie de la escalera. . . ."

Al hacer la primera de las tres conclusiones arriba transcritas, que está sustancialmente sostenida por la deposición del Administrador y a la vez Tesorero de West Indies, Arturo Martín García, según veremos más adelante, el juez sentenciador inadvertidamente se refirió en ella a "una llama

azul de candela". Es correcta la afirmación de West Indies de que de la prueba admitida no surge esa frase descriptiva y que donde aparece es en la deposición tomada a un empleado de West Indies de nombre Pedro Carrasco, la cual no fue ofrecida en evidencia. Tanto la deposición de Martín García como la del empleado Carrasco fueron tomadas a solicitud del codemandado Francisco en el mismo acto, y transcritas y cosidas por el taquígrafo en una misma pieza ambas. La deposición de Martín García fue ofrecida en evidencia por West Indies, uniéndose a ese ofrecimiento de prueba el codemandado Francisco, siendo admitida y marcada como *Exhibit P* de West Indies en la cubierta común a ambas deposiciones.

■ La inadvertencia apuntada no tiene el alcance que le atribuye West Indies pues con excepción de la referencia a la "llama azul" todos los demás extremos de la conclusión impugnada surgen de la deposición de Martín García, en la cual descansa el juez sentenciador al llegar a la conclusión de que la propia West Indies había explicado el origen de la explosión e incendio; y ciertamente la referencia adicional que a la declaración de Pedro Carrasco hace en sus conclusiones de derecho—partiendo de la creencia equivocada, como hemos visto, de que dicha deposición estaba ofrecida también en evidencia—no destruye la base de prueba en que descansa la conclusión de hecho impugnada. Creemos de rigor citar *in extenso* de la deposición de Martín García, para ilustrar tanto en cuanto a éste como en cuanto a otros extremos de la impugnación que de las conclusiones del juez sentenciador hace West Indies, lo insustancial de los errores señalados en el Primer Punto, ya que en la segunda de las conclusiones antes transcritas de nuevo incurre el juez sentenciador en otro *lapsus*—también sin consecuencias—al referirse a Pedro Carrasco como un empleado "que no trabajaba nunca en fumigación:"

"P. Que fue lo que ocurrió esa noche si lo sabe?

R. Entre seis y siete de la noche, estábamos trabajando esa noche porque teníamos un embarque urgente y cuando empezaron a entrar los operarios, no había suficiente luz en la esquina del primer piso y yo envié por una bombilla al sótano. Le dije a don Pedro que es un empleado de mucha confianza, uno de los empleados más viejos que yo tenía allí y yo me quedé en la planta alta del primer piso; aproximadamente como a los tres o cuatro minutos más o menos, como a los dos o tres minutos de él bajar, inmediatamente vino el gas fluido . . .

P. Vino qué?

R. El humo ese y corrí por la puerta seguida a avisar.

P. Usted dijo algo de gas que subía . . .

R. Humo y grité a la oficina del acueducto, que llamaran los bomberos porque algo pasaba. Inmediatamente se vió como que se había escapado el fluido que estaba en el cuarto de fumigación . . ."

.        .        .        .        .        .        .        .

"R. Yo mandé a Carrasco y yo estoy en el mismo centro de la escalera. Al él bajar cuatro o cinco escalones tiró su mano derecha. Por supuesto, el switch está detrás del poste y no podría verlo en ninguna forma, pero él puso la mano en ese sitio y allí había luz, sino él no podría seguir bajando la escalera, debido a la oscuridad reinante en ese sitio.

P. Que tiempo transcurrió desde el ademán de la mano a la llamarada?

R. Pocos segundos."

.        .        .        .        .        .        .        .

"P. Pero usted dice que él puso la mano en el poste del switch?

R. Si, señor.

P. Y después de prender el switch siguió bajando?

R. Si señor.

P. El al tocar algún sitio, prendió una luz en algún sitio?

R. Si, señor.

P. Y después de seguir bajando la escalera fue la explosión?

R. Después de pasar eso, como a los dos segundos.

P. El puso la mano en ese poste, prendió ese switch, según es de suponerse, y entonces siguió bajando?

R. Si, señor.

P. Y a los dos o tres segundos fue la explosión?

R. Si, señor.

P. Y esa explosión fue fuerte?

R. No una cosa muy fuerte, yo estaba al lado de donde yo sentí el ruido.

P. Y no notó el olor que notó antes en el conato?

R. Que conato?

P. En el conato de febrero?

R. En febrero no hubo expiración de gas. Solamente humo. En este de ahora sentí la expiración.

P. Del gas de bisulfuro?

R. Si, señor."

.　　　.　　　.　　　.　　　.　　　.　　　.

"P. Que fumigador se abrió allí?

R. El fumigador pequeño, yo lo he visto abrirse.

P. Quien lo abrió?

R. El ruido, la explosión.

P. La explosión abrió la puerta del fumigador?

R. Si, señor."

.　　　.　　　.　　　.　　　.　　　.　　　.

"P. Y cuando surgió la explosión, esa puerta se se abrió?

R. Si, señor.

P. Entonces la explosión ocurrió dentro de este fumigador y voló la puerta?

R. La puerta se abrió.

P. Después que sonó el ruido, inmediatamente me tiré abajo a ver lo que pasaba y ví la puerta abierta y ví flama.

P. La flama salía del fumigador pequeño?

R. Si, señor y corrí buscando a don Pedro.

P. Esa puerta del fumigador pequeño se quedó abierta?

R. Si, señor.

P. Y de ahí salía la llama?

R. Si, señor.

P. Esa llama se esparció por todo el local?

R. No.

P. Esa llama o se esparció a velocidad de más de 40 millas?

R. En absoluto porque yo he pasado por frente a ella.

P. Usted no recuerda haber declarado algo de eso, en algún sitio, que la llama se esparció a una velocidad como de 40 millas?

R. No, recuerdo.

P. Pero se abrió la puerta del salón donde se estaba llevando a cabo la fumigación, se abrió la puerta y de ahí salió la llama?

R. Si, señor.

P. Antes de Carrasco, que usted sepa, nadie había bajado al sótano?

R. Primero bajó un muchacho hasta la mitad de la escalera y me dijo: 'Don Arturo, yo no encuentro el switch de la escalera'.

P. Como se llama ese muchacho?

R. Pagán . . . No recuerdo . . . Ese switch está colocado detrás de una viga, es decir que al bajar, usted no lo ve. Entonces yo mandé a don Pedro y don Pedro fué alante y el muchacho detrás . . .

P. Entonces don Pedro prendió el switch y después fué la explosión?

R. Al dar la vuelta al poste de la escalera.

P. De manera que la explosión y la llama, no fué simultánea, cuando él puso la mano en el switch, sino algunos segundos después?

R. Podríamos decir como dos segundos . . .

P. Usted sabe lo que es un segundo? ¿Se dá cuenta?

R. Si, señor.

P. Desde cuando está con la West India?

R. Desde su fundación.

P. Usted es el Tesorero de ella?

R. Si, señor.

P. Desde cuando es Tesorero?

R. Desde su principio.

P. Y además, es el Manager de la factoría?

R. Si, señor."

.    .    .    .    .    .    .    .    .

"P. ¿ Ud. puede explicar donde queda el switch general de la luz?

R. Bajando por la escalera a mano derecha."

En cuanto a la tercera de las conclusiones impugnadas por West Indies en este Primer Punto basta citar de la declaración del testigo Domingo Osorio lo siguiente:

"P. Usted nos puede decir si dentro del sótano había alguna luz artificial?

R. Una bombilla grande, creo que de 100 W. o 125 Watts. Había cinco bombillas de esas.

P. Y como estaban instaladas?

R. Pegadas en el plafón y el cordón que venía, venía pegado por el plafón también.

P. Y como se prendían y se apagaban esas bombillas?

R. Por medio de un switch que había en la escalera. Cuando veníamos bajando se le daba al switch y prendía la bombilla.

P. Cómo prendía esa bombilla?

R. De esas que se le dan para arriba y para abajo.

P. Y cuando le daban al switch que pasaba?

R. Prendían las bombillas del sótano.

P. Díganos si esas bombillas del sótano cada una tenía un switch individual?

R. Tenían unas cadenitas.

P. Para que eran esas cadenitas?

R. Para apagarlas; después del switch se la 'jalaba' la cadenita y ahí apagaba.

P. Como prendían y apagaban esas bombillas?

R. Cuando íbamos para abajo la prendíamos con el switch que había en la escalera y cuando terminábamos de trabajar la apagábamos con la cadenita esa."

Y de la declaración de Angel Hernández:

"P. Donde estaba el dron de bisulfuro?

R. Debajo de la escalera de subir para arriba.

P. Pero dentro o fuera del sótano?

R. Dentro del sótano.

P. Dentro del sótano y fuera de los fumigadores?

R. Si, señor. Y habían bombillas . . .

P. Cuantas había más o menos?

R. Ocho o diez bombillas.

P. Grandes o pequeñas?

R. Grandes, igual que las de los fumigadores.

P. Como se apagaban y prendían esas bombillas?

R. Había un switch general para todas, pero todas no prendían con el switch general porque algunas no estaban en contacto con ese switch. Cuando se le daba al switch prendían las que estaban en contacto con ese switch y si había que prender alguna más, se atornillaba y si no prendía, entonces, se le daba a un switch que había y prendía.

P. Entonces, cada una tenía su switch individual, además de su switch general?

R. Si, señor.

P. Y cerca del dron había bombilla?

R. Si, señor.

P. Y como estaba instalada esa bombilla?

R. Estaba colgada del techo, de un cordón.

P. Y como prendía y apagaba?

R. Si no prendía y apagaba con el switch general se atornillaba y si no con una cadenita que tenía allí . . .''

La determinación de la responsabilidad de West Indies—en tanto examinamos la prueba de actos específicos de negligencia que conforme a las conclusiones del juez sentenciador explican el origen del incendio—no depende de la mayor o menor exactitud con que el magistrado haya hecho referencia a algún detalle de la prueba a ese respecto, pues ello no cambia el hecho básico de la ocurrencia del incendio, ni tampoco el origen del mismo. No cabe, pues, estimar este Primer Punto de West Indies contra la sentencia dictada en su contra.

*Segundo Punto:* West Indies señala en este Segundo Punto de su alegato, como contrarios a la evidencia en el caso, 18 extremos de las conclusiones de hecho del tribunal sentenciador:

a) Sostiene que no hay prueba de que existiese ningún switch eléctrico "al pie de la escalera". En verdad carece de base, como de importancia, este señalamiento. Ya hemos visto, por la deposición de Martín García, Administrador de la West Indies, que el switch general de la luz quedaba "bajando por la escalera a mano derecha"; que "a la mitad de la escalera estaba el switch"; que al bajar su empleado Carrasco "cuatro o cinco escalones tiró su mano derecha"; que "el switch está detrás del poste"; que Carrasco prendió el switch y la explosión fue "al dar la vuelta al poste de la escalera", "como dos segundos después". En igual sentido, de la declaración de Domingo Osorio, surge que las bombillas del sótano se prendían y apagaban "por medio de un switch que había en la

escalera". "Cuando veníamos bajando se le daba al switch y prendía la bombilla".

La frase "al pie de la escalera" está razonablemente sostenida por la prueba. West Indies tiende a dramatizar la supuesta inexactitud para dar colorido a la teoría de su perito Colón de que por ser el gas de bisulfuro 2.6 más pesado que el aire, no podía haber suficiente concentración de dicho gas alrededor del switch (que West Indies sitúa, por el señalamiento (j) de este Segundo Punto *pegado al techo*, a unos 9 pies del piso) que diera lugar a la explosión. El hecho cierto, sin embargo, es que la explosión ocurrió casi coetáneamente al prenderse ese switch, cualquiera que fuese la teoría del perito de West Indies.

b) En cuanto a la afirmación del juez sentenciador de que el Administrador de West Indies mandó un empleado "que no trabajaba nunca en fumigación", ya hemos indicado anteriormente que éste fue un *lapsus* del magistrado, que no tiene importancia alguna, ya que las instrucciones del Administrador Martín García al empleado Carrasco de que fuera al sótano a buscar una bombilla, fueron una reiteración de las que primeramente dio a otro empleado que bajó y no encontró el switch. Por lo tanto, si Carrasco trabajaba o no en fumigación, no es factor que influya o altere el hecho de que tenía que prender el switch para buscar la bombilla, pues según el propio Martín García "él no podía seguir bajando la escalera debido a la obscuridad reinante en ese sitio".

c) West Indies impugna también como contraria a la prueba la conclusión de que "ciertamente la evidencia demostró una absoluta indiferencia y falta general de cuidado de parte de la West Indies hacia la manera como se manejaba, se almacenaba y transportaba una materia inflamable y explosiva como el bisulfuro de carbono". La dificultad con este señalamiento es que West Indies lo predica en la declaración de su testigo Nazario y la conclusión impugnada se funda, obviamente, en los testimonios a que dio crédito el juez senten-

ciador de los testigos Osorio, Hernández y otros de la demandante. El propio Administrador Martín García, declaró que la noche anterior al incendio el dron de bisulfuro "fue traído al sótano", no obstante afirmar en otra parte de su deposición que el bisulfuro de carbono lo guardaban en el garage y que la noche del fuego no había ninguno en la fábrica, pues el dron vacío lo habían sacado la noche antes hacia el garage. La prueba de la demandante, creída por el juez sentenciador, sostiene sus conclusiones respecto a la manera en que manejaba el bisulfuro de carbono usado en la fumigación.

d, e, f) Por estos señalamientos impugna West Indies las conclusiones del juez de instancia de que la prueba de la propia West Indies sobre el origen del incendio reveló su negligencia y falta de cuidado, ya que demostró que la explosión "fue ocasionada por el efecto de una chispa eléctrica sobre el gas de bisulfuro presente entonces en el sótano o en el fumigador en suficiente concentración", por lo que "o había escape copioso de gas del fumigador, o había suficiente concentración de gas en el propio sótano".

La anterior conclusión responde al análisis de la deposición de García que hace el juez sentenciador a base de las declaraciones de los peritos en el sentido de que "solamente con una concentración suficiente de gas de bisulfuro en aquella atmósfera sería posible la explosión de producirse una chispa eléctrica o de fuego en el sótano".

Martín García, en su deposición declaró que "como a los 2 ó 3 minutos de él [Carrasco] bajar, inmediatamente vino el gas fluído . . . el humo ese y corrió por la puerta seguida a avisar . . . Inmediatamente se vio como que se había escapado el fluído en el cuarto de fumigación".

"P. Usted percibió ese gas?

R. Yo sentí un ruido y percibí como un humo.

P. Pero usted dijo que se había escapado el vapor de los tanques . . .

R. Por el olor.

P. Entonces usted sintió el olor del vapor del bisulfuro de carbono?

R. Es lo que yo supongo; yo corrí al frente para que llamaran los bomberos y fui abajo y al ver las llamas fui a buscar al viejito, a Don Pedro . . . ."

West Indies desarrolla la teoría de que hubo dos explosiones: una poco después de las 6 de la noche y la otra alrededor de las 7 de la noche. Sostiene que fue error del Tribunal de Instancia no determinarlo así.

Esta teoría carece en absoluto de base en la prueba. Todos los testimonios fueron al efecto de que ocurrió una sola explosión. La magnitud de ésta puede inferirse del hecho de que destruyó las vitrinas del edificio del Servicio de Acueductos situado al lado opuesto de la Avenida Fernández Juncos.

g) Por este apuntamiento West Indies atribuye al juez sentenciador no haber entendido la deposición de Martín García, al llegar a la conclusión de que la explosión ocurrió al prender Carrasco el switch. Se basa nuevamente West Indies en la imposibilidad de que existiera suficiente concentración del gas de bisulfuro de carbono en el sótano, según su perito Colón. Pero el hecho de la explosión coincidentemente con el acto de Carrasco prender el switch queda inalterado.

h) West Indies afirma que no permitió escape substancial del gas de bisulfuro y que no fue escape alguno de gas lo que causó el desastre. Nada expone sin embargo en apoyo de esta afirmación.

i, j, k, l) Sostiene West Indies que una primera explosión ocurrió en la pared del sótano y una explosión subsiguiente en el fumigador pequeño. Ya hemos indicado que la prueba sólo reveló una explosión, seguida inmediatamente del incendio. Impugna igualmente la conclusión del juez sentenciador de que era altamente improbable la teoría de West Indies de que la explosión ocurrió debido a que las paredes del sótano estaban tan copiosamente infiltradas del gas explosivo que el calor

de los anafres usados en su negocio por Evaristo Rivera fue la causa de la misma.

Evaristo Rivera, dueño de un pequeño cafetín situado hacia el extremo Este del edificio, declaró que había una distancia de 15 pies desde la pared más próxima del edificio al sitio donde él prendía los fogones de su kiosko. Convenimos con Goenaga en que de aceptarse como cierta la teoría de West Indies de que había tan copiosa infiltración del gas de bisulfuro de carbono en las paredes del sótano que aun el calor de un anafre al aire libre, situado a 15 pies de distancia, podría ocasionar un desastre, ello revelaría indudablemente la existencia de un *nuisance* sostenido por West Indies, en cuyo caso resultaría responsable de los daños que causara, con o sin negligencia.

La conclusión de que Evaristo Rivera "usaba casi diariamente" en su negocio de fonda anafres de carbón encendido, de ser errónea, tendería a favorecer a West Indies; mas no está desprovista de base en la prueba, ya que resulta evidente que al mencionar Rivera en su testimonio los "viernes y sábado" se estaba refiriendo necesariamente a la clase de comida "que ponía los viernes a hacer allí en la acera", pues ya antes había declarado que los empleados tanto de West Indies como de Goenaga comían allí y él entraba "a cobrar a algunos que no me habían pagado la semana".

Igualmente es insubstancial la impugnación a la conclusión de que de las planchas de gas líquido que usaba en su negocio de vulcanización de gomas y tubos de automóviles Víctor Luciano Colón, salían "llamas y chispas". Si no salían chispas, el testigo Colón declaró que al prender las planchas de gas líquido con fósforos, *la llama* salía por arriba.

El señalamiento "m" de este Segudo Punto impugnando como contraria a la prueba la conclusión de que con motivo del conato de incendio del 26 de febrero "todos los empleados de West Indies y los de la fábrica de la demandante rápidamente salieron alarmados del edificio" encuentra apoyo en el tes-

timonio de Esther Colón de Balseiro, quien declaró que vio el humo "que asfixiaba a uno", que gritaron "Fuego!", que las demás personas "todas se salieron a la calle y no podían estar porque se asfixiaban"; y en el del Lic. Adolfo García Rodríguez, quien declaró que al llegar al edificio encontró que había "mucho humo que salia de la puerta principal" y que "había mucha gente alarmada afuera", que trató de entrar con los bomberos que le acompañaban pero no pudieron hacerlo porque era "un humo negro asfixiante que no se podía soportar", "que no era el humo corriente", retirándose entonces y dando la orden de que los bomberos usaran caretas.

Por el señalamiento "n". West Indies impugna una conclusión que no ha hecho el juez sentenciador. Le atribuye haber concluido que inmediatamente después del conato la póliza de seguro fue cancelada. No es correcta esa afirmación. Lo dicho por el magistrado fue que la suma de $234.25 reclamada por West Indies a la Hanover Fire Insurance Company por las pérdidas sufridas con motivo del conato "le fue satisfecha a West Indies por la referida compañía de seguros, pero casi inmediatamente después la póliza le fue cancelada a West Indies antes de su vencimiento normal". El testimonio de Manuel San Juan, hijo, fue exactamente en ese sentido.

La conclusión impugnada por el señalamiento "o" de que "al terminarse el proceso de fumigación, o antes si se necesitaba urgentemente el tabaco para embarcarse, los cuartos de fumigación se abrían y se extraía el tabaco para ser empacado y embarcado" encuentra apoyo en la prueba de la demandante y en efecto lo que pide West Indies es que se descarten por falsos los testimonios de Osorio y Hernández.

El señalamiento "q" no lo plantea West Indies por ser la conclusión que en él impugna contraria a la prueba, sino más bien por considerarla una "exageración". Concediendo que no "todos" los empleados de West Indies se tiraron por las ventanas, sí hubo prueba de que algunos lo hicieron.

Los señalamientos "p" y "r" atribuyen error al juez sen-

tenciador en su exposición de las propiedades y características de bisulfuro de carbono. ([4]) Independientemente de si el con-

([4]) Sobre las propiedades del bisulfuro de carbono y su uso como fumigante las partes ofrecieron amplio testimonio pericial.

En los *Códigos Nacionales de Incendio* publicados por la National Fire Protection Association, International, 1951, Tomo I, pág. 517 se describe así el proceso de fumigación con gas de bisulfuro de carbono:

"80. *Fumigación con Gas de Bisulfuro de Carbono*

Este producto es un fumigante satisfactorio desde el punto de vista de la exterminación de insectos. Sus vapores son más pesados que el aire y penetran a través de una masa de fibras distribuyéndose con relativa uniformidad. *Es volátil y es difícil circunscribirlo al sitio que se ha de fumigar.* Una exposición continuada a los vapores del bisulfuro de carbono es peligrosa para las personas. La exposición a concentraciones leves produce mareo, sin ulteriores consecuencias graves.

El vapor del bisulfuro de carbono *es extremadamente explosivo.* Su *punto de ignición es bajo* y está sujeto a detonación. El mejor ejemplo de su peligro lo constituye el hecho de que una barra de hierro calentada con agua hirviendo y pasada a través del gas lo estalla. Una bombilla eléctrica es suficientemente caliente para estallar el gas, o el calor producido por el sol sobre un techo metálico puede provocar la explosión. *Este producto, por lo tanto, se considera demasiado peligroso para la fumigación general, y no se recomienda su uso.*

Se usa hasta cierto punto en edificios aislados construidos con ese fin, para fumigar sacos usados o existencias infestadas. Al permitirse su uso, muchos operadores de fábricas utilizan el bisulfuro de carbono para fumigar granos en vehículos colocados a considerable distancia de toda edificación. Los vehículos que se hayan fumigado así deben ser bien aireados antes de que los granos sean descargados en los molinos o elevadores." (Subrayado nuestro.)

En la Tabla de Substancias Químicas Corrientes Peligrosas, a la pág. 613 de la misma obra se describe el riesgo de incendio de bisulfuro de carbono así:

"Un líquido altamente volátil de olor desagradable, que dimana, aún a temperaturas comparativamente bajas, *vapores* que forman con el aire *mezclas inflamables y explosivas.* Punto de ignición (flash point)—30°C. (22°F) (3) Campo de Inflamabilidad 1% a 50% (4) (propagación hacia arriba). La temperatura de inflamación es peligrosamente baja, siendo alrededor de 100° a 106°C. (3) (212° a 223°F). Es endotérmico, y *sus vapores pueden estallar mediante un fuerte golpe.* Los vapores son más pesados que el aire (la densidad del vapor es de 2.62), y pueden recorrer una distancia considerable a una fuente de ignición y encender el punto de origen. *Es más peligroso que la gasolina.*" (Subrayado nuestro.)

Para el almacenaje se recomienda lo siguiente:

"Aíslense y asegúrense los envases contra daño mecánico y golpes metálicos, y manténgase en compartimiento *a baja temperatura fuera del alcance del sol u otra fuente de ignición, incluyendo accesorios de alumbrado*

cepto de "volátil" debió haber sido expuesto con relación al bisulfuro de carbono en sí, que es un líquido, y no al gas que se produce por evaporación, según lo hizo el juez sentenciador, es lo cierto que los peritos de las partes coincidieron en que para producirse la explosión por una chispa al prender el switch tenía que existir en el sótano una concentración de gas de bisulfuro suficiente para incendiarlo.

En resumen, los 18 señalamientos de West Indies apuntando error en las conclusiones del juez de instancia, por considerarlas contrarias a la prueba, van dirigidos a la apreciación que de ésta hiciera dicho magistrado. Por el examen que hemos hecho de estos señalamientos concluimos que no cabe tampoco estimar este Segundo Punto en contra de la sentencia.

*Tercer Punto: "Las siguientes conclusiones del tribunal sentenciador están basadas en evidencia tan palpablemente falsa y tan palpablemente absurda que razonablemente no debe dársele ningún crédito, y dichas conclusiones son manifiestamente erróneas."*

(a) "West Indies compraba el bisulfuro de carbono en forma líquida en drones de 550 libras cada uno, y los almacenaba en el garaje, salvo que dentro del sótano guardaba continuamente un dron en uso; es decir, el dron del cual se sacaba corrientemente el bisulfuro para uso inmediato en los fumigadores."

(b) ". . . Dentro de los cuartos de fumigación también habían bombillas corrientes y en el exterior de dichos cuartos había un conmutador que controlaba las bombillas interiores, las cuales también podían prenderse y apagarse manualmente. . . ."

(c) ". . . En contraste algunas de las bombillas del sótano y de los cuartos de fumigación eran prendidas y apagadas por los empleados de West Indies desenroscándolas manualmente de sus zócalos. A veces esto producía chispas o 'shock' eléctrico a dichos empleados especialmente cuando estaban muy sudados."

(d) ". . . Debido a la gran concentración de gas de bisulfuro que había corrientemente en los cuartos de fumigación, al abrirse

---

*eléctrico* y otro equipo eléctrico. Los tanques de almacenaje deberán ser construidos sobre cubetas de concreto que contengan agua, y el bisulfuro de carbono debe estar cubierto constantemente por agua o gas inerte."

estos el resto del sótano se inundaba de gas, haciendo casi imposible estar allí . . . . El gas de bisulfuro penetraba por todas partes y se sentía por las mañanas hasta el primer piso. . . ."

(e) ". . . Había poca ventilación especialmente durante las noches porque entonces se cerraban las ventanas. "

West Indies tendió a desacreditar los testimonios de Osorio y Hernández, testigos de la demandante durante el juicio. Igual posición asume ante este Tribunal apuntando extremos contradictorios en sus respectivos testimonios que a su juicio les hacen inherentemente increíbles. Al argumentar el señalamiento "a" de este Tercer Punto impugnando aquella parte de la conclusión del tribunal sentenciador de que West Indies "dentro del sótano guardaba continuamente un dron en uso, es decir, el dron del cual se sacaba corrientemente el bisulfuro para uso inmediato de los fumigadores", West Indies racionaliza indicando que de todas maneras si el bisulfuro de carbono era sacado de los drones en un balde y el balde a su vez se llevaba hasta la puerta del fumigador para vaciarlo en las poncheritas que iban a colocarse dentro de éste, ¿qué necesidad tenía West Indies de tener el dron en el sótano cuando podía sacarse el bisulfuro en el garage y conducirlo en el balde hasta el fumigador?

West Indies destruye su propio argumento con el testimonio del Administrador y Tesorero, Arturo Martín García, quien declaró en su deposición que la noche anterior al incendio el dron de bisulfuro que se estaba usando "fue traído al sótano" y de él echó el bisulfuro en las palanganas pequeñas. Luego, ¿para qué traerlo?

La impugnación que hace West Indies en los señalamientos "b" y "c" por falsedad en los testimonios de Osorio y Hernández en cuanto a la existencia de un conmutador en el exterior de los cuartos de fumigación y a que algunas de las bombillas del sótano eran prendidas y apagadas desenroscándolas manualmente de sus zócalos produciendo a veces chispas o *shock* eléctrico, aparte de no tener base en la prueba, no se apuntan

por el juez sentenciador como hechos que dieron origen a la explosión e incendio que destruyó el edificio.

En cuanto a los señalamientos "d" y "e" la dificultad principal de West Indies parece ser cuestión de grado: en cuanto al "d" la "gran" concentración de gas, y en cuanto al "e" la "poca" ventilación. En ambos casos las conclusiones están sostenidas por la prueba.

En ninguno de los cinco señalamientos de impugnación podemos convenir con West Indies en su teoría de que las conclusiones están fundadas en prueba inherentemente increíble y falsa.

*Cuarto Punto: "Las conclusiones de derecho del Tribunal sentenciador en el sentido de que la doctrina res ipsa loquitur era aplicable al caso y que el desastre sólo puede haber ocurrido como resultado directo de la negligencia de West Indies son erróneas."*

En cuanto a este punto West Indies se limita (1) a reiterar por vía de mera afirmación los señalamientos hechos en el Primero, Segundo y Tercer Puntos ya considerados, de que las conclusiones del juez sentenciador en el sentido de que West Indies fue negligente, están basadas en hechos no admitidos en evidencia, no están sostenidas por la evidencia en el caso y se fundan en testimonio tan palpablemente falso y absurdo que razonablemente no debe dársele crédito; y (2) que toda vez que la prueba no contradicha demuestra que el desastre pudo haber ocurrido como resultado directo de los anafres de carbón pegados a la pared del fumigador, y probablemente fue resultado de ello, siendo dicha causa un agente exterior independiente de la factoría de West Indies y de su operación, la doctrina de *res ipsa loquitur* no es aplicable al caso.

■ El juez sentenciador determinó correctamente que en cuanto respecta a la responsabilidad de West Indies la doctrina de *res ipsa loquitur* era aplicable.

La concurrencia de los tres requisitos que generalmente

se consideran necesarios para la aplicación de dicha doctrina están presentes en el caso, descartando para los fines del examen de la cuestión planteada el testimonio de Arturo Martín García, Administrador de West Indies:

"(1) el accidente debe ser de tal naturaleza que ordinariamente no ocurra en ausencia de negligencia por parte de alguna persona; (2) debe ser causado por una agencia, o instrumentalidad dentro del control exclusivo del demandado; (3) no puede haber sucedido debido a acción voluntaria alguna o negligencia contribuyente del demandante." *Hermida* v. *Feliciano*, 62 D.P.R. 55, 57–8.

■ La teoría de West Indies de que había tal infiltración de gas de bisulfuro de carbono en las paredes del fumigador que la explosión ocurrió debido al calor proveniente de los anafres del kiosco o cafetín de Evaristo Rivera no solamente es altamente improbable, como resolvió el juez sentenciador, sino que los hechos niegan base alguna a dicha teoría por la distancia a que se encontraban dichos anafres de las paredes del sótano. Prescindiendo de la deposición de Martín García, la doctrina de *res ipsa loquitur*, tal como la hemos aceptado en nuestra jurisprudencia[5] y se expone en otras jurisdicciones, [6] tiene aplicación en este caso.

---

[5]*Matta* v. *Pueblo Super Market*, 80 D.P.R. 514 (1958); *Martínez* v. *U.S. Casualty Co.*, 79 D.P.R. 596 (1956); *Rodríguez* v. *Aponte*, 78 D.P.R. 756 (1955); *Cintrón* v. *A. Roig, Sucrs.*, 74 D.P.R. 1028 (1953); *Román* v. *Mueblería Central*, 72 D.P.R. 341 (1951); *Padilla* v. *García de Quevedo*, 62 D.P.R. 800 (1944); *Rodríguez* v. *White Star Bus Line*, 54 D.P.R. 310 (1939); cf. *Kirchberger* v. *Gover*, 76 D.P.R. 907 (1954); *Hermida* v. *Feliciano*, supra.

[6]*Sweeney* v. *Erving*, 228 U.S. 233; 57 L.Ed. 815; *Commercial Molasses Corp.* v. *New York Tank Barge Corp.*, 314 U.S. 104, 86 L.Ed. 89; *Bohlen* v. *Glenn L. Martin Co.*, 67 A.2d 251; *Frenkil* v. *Johnson*, 3 A.2d 479, 481; *Sistrunk* v. *Texas Holding Co.*, 264 Pac. 259, 262; *Standard Oil Co.* v. *Midgett*, 116 F.2d 562 (4th Cir. 1941); *Implement Dealers Mut. Fire Ins. Co.* v. *Golden et al.*, 44 N.W.2d 264; *Koehler* v. *Thiensville State Bank et al.*, 14 N.W.2d 15; *Phillips Petroleum Co.* v. *Berry*, 65 S.W.2d 533; *Guilford* v. *Foster & Davis*, 268 Pac. 299; *Hagan & Cushing Co.* v. *Washington Water Power Co.*, 99 F.2d 614; *Warner* v. *Pittsburgh–Idaho Co.*, 220 Pac. 492; *Levin* v. *New York Central & HRR Co.* 133 N.Y.S. 467; *Stone* v. *Texas Company*, 105 S.E. 425; *Newton* v. *Texas Co.*, 105 S.E.

Independientemente de ello, una vez admitida la deposición de Martín García, resulta innecesario descansar en la inferencia de negligencia suplida por *res ipsa loquitur* ya que en efecto quedó establecido por dicho testimonio que la explosión ocurrió cuando otro empleado de West Indies prendió un switch eléctrico en el sótano. La propia prueba de West Indies demostró que la explosión ocurrió en el fumigador pequeño y que éste no tenía pared alguna en contacto con el negocio de Evaristo Rivera. Tanto bajo la doctrina de *res ipsa loquitur* como por los hechos específicos de negligencia y falta de cuidado que estimó probados el juez sentenciador, fue correcta su determinación sobre la responsabilidad de West Indies.

## Recurso de Goenaga

El juez sentenciador exoneró al codemandado Francisco de responsabilidad fundándose en el hecho de que éste, como dueño del edificio, no tenía control, custodia o posesión alguna en los negocios de West Indies ni del local ocupado por ésta,

435; *Howard* v. *Texas Co.*, 169 S.E. 832; *Pulvin* v. *Hudson Auto Lamp*, 172 N.Y.S. 340; *Chiles* v. *Ft. Smith Commission Co.*, 215 S.W. 11; *Rathbourn* v. *White*, 107 Pac. 309; *Tyreco Refining Co.* v. *Cook*, 110 S.W.2d 219; *Gulf Refining Co.*, v. *Delavan*, 203 F.2d 769.

Véanse anotaciones en: 22 A.L.R.2d 791; 56 A.L.R. 593; 39 A.L.R. 1006; 8 A.L.R. 500, 1250; y Seavey, *Res Ipsa Loquitur: Tabula in Naufragio*, 63 Harv. L. Rev. 643; Prosser, *The Procedural Effect of Res Ipsa Loquitur*, 20 Minn. L. Rev. 241; Heckel and Harker, *Effect of the Doctrine of Res Ipsa Loquitur*, 22 Ill. L. Rev. 724.

En el Derecho español véase a Puig Brutau, T. II(2), *Fundamentos de Derecho Civil*, pág. 681–682; ". . . El criterio normal es el de considerar que incumbe al actor la carga de probar la culpa del demandado. Pero esta prueba puede resultar verdaderamente difícil, por cuya razón se manifiesta en este punto una doble tendencia deformadora de la regla general de que la prueba incumbe al actor. El daño se habrá producido en ciertos casos de una manera o en tales circunstancias que lo razonable será presumir la culpa del demandado (res ipsa loquitur). En otras ocasiones, el mismo desplazamiento de la carga de la prueba puede responder, no a la circunstancia de que existe la presunción de culpa del demandado, sino en la conveniencia de producir un efecto equiparable al derivado de la responsabilidad sin culpa pero fundada en una actividad peligrosa."

Cf. *Morales Mejías* v. *Met. Pack. & Ware. Co.* 86 D.P.R. 3 (1962).

especialmente del sitio donde West Indies fumigaba tabaco con bisulfuro de carbono, por lo cual, en derecho, cualquier negligencia de West Indies no le era imputable a Francisco. No obstante lo anterior, llegó también a las siguientes conclusiones:

"Ahora bien, el co-demandado Sr. Francisco hubiese sido negligente si la fumigación de tabaco con bisulfuro de carbono de parte de la West Indies hubiese sido continua e inherentemente peligrosa. En tal caso el deber del arrendador hubiese sido el de prohibir la continuación de esa actividad. El no cumplimiento de ese deber hubiese implicado negligencia de parte de don Miguel Francisco. Sin embargo, la hemos resuelto que la fumigación de tabaco con bisulfuro de carbono no es de por sí inherentemente peligrosa, sino que se puede llevar a cabo, sin riesgo alguno, tomándose las precauciones adecuadas. Por lo tanto, don Miguel Francisco no tenía el deber de descontinuar esa actividad, o de exigir de la West Indies que no continuase fumigando tabaco con bisulfuro de carbono. En ausencia de tal obligación, no podemos llegar a la conclusión de que don Miguel Francisco fue negligente. Aunque el arrendamiento entre la West Indies y don Miguel Francisco era de mes en mes, el co-demandado Sr. Francisco no estaba tampoco obligado a descontinuar el arrendamiento por el mero hecho de que la West Indies fumigaba tabaco con bisulfuro de carbono, ya que tal actividad no envolvía riesgos o peligros inherentes. El arrendador actuaba razonablemente al creer que la West Indies no sería negligente en la fumigación de tabaco con bisulfuro de carbono. Tenía derecho a presumir que la arrendataria continuase actuando en forma razonable y tomando todas las precauciones adecuadas del caso. En el curso normal de los negocios se debe descansar en la buena fe y en la presunción razonable de que se actuará en forma cuidadosa, y no en forma negligente.

"Podría surgir negligencia de parte de un arrendador al tener conocimiento de la existencia de sustancias inherentemente inflamables o explosivas en su inmueble, ya que el hecho de existir tales sustancias implica una condición continua de peligrosidad, pero un arrendador no es responsable de permitir una actividad económica que es y ha sido siempre usual en la comunidad y que de por sí no es peligrosa."

En su recurso, Goenaga, aceptando los hechos establecidos por el tribunal de instancia sostiene, como cuestión de derecho, que fue error eximir a Francisco de responsabilidad por los daños sufridos como consecuencia del incendio.

A los hechos establecidos respecto a las condiciones del edificio propiedad de Francisco, al conocimiento de éste al arrendar parte del mismo a West Indies de que lo dedicaría a un negocio de elaboración de tabaco, a la forma y manera en que West Indies almacenaba y manejaba el bisulfuro de carbono y llevaba a cabo el proceso de fumigación, al conato de fuego, a la notificación y advertencia de Goenaga a Francisco ese mismo día como consecuencia del conato (véase escolio 3) para que diera atención inmediata al asunto en previsión de una catastrofe debido a que el edificio no reunía "las propiedades para tener en el mismo un negocio de la índole de la West Indies" que al mismo tiempo la protegiera a ella de fuego, a la respuesta de Francisco ([7]) aconsejándole que si temía a "la negligencia del vecino de abajo" debía ponerse

---

([7]) "Muy estimada Sra. Goenaga:

.     .     .     .     .     .     .     .

"Refiriéndome ahora a su carta de fecha 26 de Febrero en la que me habla del conato de fuego que hubo en los bajos de su taller debo decirla que dicha carta me sorprendió grandemente.

"Como puede Ud. mi distinguida Sra., creer que por un segundo tenga yo ingerencia en los negocios del vecino de abajo? Ud. es persona inteligentísima y no ignora que accidentes acaecen aun donde existe el mayor cuidado.

"La West Indies Trading Co. a quien le tengo arrendada la planta baja del edificio que ocupa Ud. es una empresa seria y no tengo motivos para sospechar negligencia de su parte; pero de todos modos hay dos medios de protegerse contra su negligencia y son; primer asegurando Ud. su propiedad en cantidad suficiente para protegerse contra cualquier perdida o dejar que otra corra el riesgo luego que Ud. haya abandonado el local.

"A la verdad Doña Conchita, en los largos años de experiencia que tengo esta es la primera vez que oigo decir que pueda tener responsabilidad el dueño de una finca por los actos voluntarios ó involuntarios de uno de sus inquilinos.

"Ud. perdonará que le aconseje que si Ud. teme la negligencia del

"a distancia conveniente del sitio de peligro", existen los siguientes hechos que surgen de la prueba documental elevada ante nos: ([8])

Francisco tenía el edificio asegurado por $25,000 mediante póliza con la Unity Fire Insurance Corporation por el período de un año a partir de agosto 7, 1945. A esa póliza se le unió el 25 de enero de 1946 un endoso concediendo permiso al asegurado para fumigar periódicamente el local cubierto por la misma. En 22 de enero de 1946 Francisco obtuvo otra póliza con la Rhode Island Insurance Co. por la suma de $10,000 sobre su edificio, destinado, según se consignó en dicho documento "a almacén de cigarros y cuarto de fumigación el sótano; la segunda planta como fábrica de cigarros y el resto taller de costura." En la propia póliza se hizo constar que en consideración "al pago adicional de un premio de 5% se permite fumigar periódicamente en el local descrito bajo estas pólizas."

■ Por otra parte, en las conclusiones del tribunal sentenciador se evidencia cierta inconsistencia entre aquellas que establecen las propiedades o características del bisulfuro de carbono y el gas de bisulfuro, de un lado, como "materias sumamente inflamables y explosivas" cuyos "vapores o gases

---

vecino de abajo debe Ud. ponerse a distancia conveniente del sitio de peligro.

"Puede Ud. contar, mi distinguida Doña Conchita, que siempre estoy dispuesto a complacerla en todo aquello que sea razonable.

Su seguro servidor,
(Fdo.) Miguel Francisco"

([8]) Hubo además prueba en el juicio de que Francisco fue advertido por Goenaga, al arrendarle aquél a West Indies, del riesgo que representaba el negocio que ésta iba a establecer, en el cual utilizaría bisulfuro de carbono para la fumigación del tabaco. También pasó prueba en el juicio de que Francisco iba a menudo por el edificio y que en más de una ocasión estuvo en el sótano del edificio ocupado por West Indies. Aunque estos hechos no forman parte de las conclusiones del tribunal sentenciador, tampoco hizo el magistrado conclusiones de que Francisco no tuviera conocimiento de que West Indies fumigaba el tabaco en su negocio y usara para ello bisulfuro de carbono, aunque sí las hizo de que Francisco no tenía conocimiento de que West Indies lo hiciera negligentemente.

pueden ser explotados por chispas, fricción, llamas o destellos de fuego", pudiendo "ocasionar una explosión tan solo con el destello que produce una bombilla eléctrica de tipo corriente", y que por ser dicho gas "en extremo volátil" es "casi imposible evitar que se escape aún de un espacio completamente cerrado", por lo cual "se considera que las operaciones de fumigación con gas de bisulfuro constituyen un peligro latente a menos que se tomen las debidas precauciones y cuidado", y de otro lado la conclusión de que "la fumigación de tabaco con bisulfuro de carbono no es de por sí inherentemente peligrosa." Esta última no parece corresponder a las propiedades del gas de bisulfuro de carbono. Ya hemos visto que en los *Códigos Nacionales de Incendios*—escolio 4—se hace constar que dicho gas "se considera demasiado peligroso para la fumigación general y no se recomienda su uso." El propio perito de Francisco admitió que "el riesgo [de fuego o explosión] siempre está cuando se usa cualquier combustible." Es precisamente por ser el bisulfuro de carbono un líquido altamente volátil, cuyos vapores son más pesados que el aire con el cual forman mezclas *inflamables* y *explosivas*—con una temperatura de ignición "peligrosamente baja"—que está siempre presente el potencial riesgo de incendio o explosión. Son los gases que se producen por evaporación y no el líquido de bisulfuro de carbono en sí los que ejercen la acción fumigante. Es por eso que la actividad de fumigación reviste el carácter de peligrosa, ya que el riesgo sigue a la propia naturaleza del agente fumigador, sin que obste para ello el que, en instalaciones adecuadas, manejado con sumo cuidado y con las precauciones aconsejables, pueda desarrollarse dicho proceso con relativa seguridad.

A la luz de todos los hechos y circunstancias presentes en este caso, fácil es advertir que cuando Francisco arrendó a West Indies el sótano y una parte del primer piso de su edificio para dedicarlo al negocio de elaboración de tabaco, impuso a Goenaga una situación de continua peligrosidad como co-

arrendataria de West Indies, debido al riesgo potencial envuelto en el uso por West Indies en el negocio al que iba a destinar el local arrendado, de un agente "demasiado peligroso para la fumigación", como lo es el gas de bisulfuro de carbono. [9] Véase, sobre el "notorio riesgo de peligrosidad" que implica el hecho de almacenar "materias inflamables y propicias a la explosión", como la nitrocelulosa, la sentencia de 14 de octubre de 1957, 62 Jurisp. Civil 1044, 1048; [10] y en cuanto al "peligro notorio" del petróleo, las sentencias de 5 de diciembre de 1958 y de 18 de enero de 1960.

■ Entre las obligaciones de ley que la relación arrendaticia produce en el arrendador está la de mantener al arrendatario en el goce pacífico del arrendamiento por todo el tiempo del contrato. Art. 1444, Inciso 3, Código Civil, equivalente al 1554 del Español. En virtud de esta obligación, que la doctrina llama de *garantía*, "el arrendador ha de responder de los hechos propios o ajenos, que perturben al arrendatario en el pacífico disfrute de la cosa arrendada y de los vicios de ella que le impidan o dificulten ese goce." 4 Castán, *Derecho Civil Español*, 8va. Ed., 259. El arrendador—en garantía contra la perturbación por hecho *propio*—"debe abstenerse de realizar todos aquellos actos que puedan impedir o perturbar el uso de la cosa por el arrendatario", por lo que, según Castán, además de estarle vedado variar la forma de la cosa arrendada, conforme al Art. 1557 del Código Civil Español (equivalente al 1447 nuestro) "Hay que entender que no podrá tampoco usar de su derecho de propietario sobre la parte de

---

[9] La Ordenanza de 20 de febrero de 1920 "Estableciendo Reglas para el Almacenado de Líquidos Combustibles dentro de la Municipalidad de San Juan" requería la obtención de un permiso que, se concede, no tenía West Indies. "Líquidos Combustibles" se define en dicha Ordenanza como "todo producto líquido o viscoso *que emita vapores inflamables* a una temperatura menor de 100°F . . . pero que arda al ser encendido." El bisulfuro de carbono ciertamente cae dentro de dicha definición.

[10] El perito del codemandado Francisco declaró que "Dentro de los explosivos peligrosos no estaría ni el bisulfuro de carbono ni la nitrocelulosa."

cosa no arrendada, en forma que produzca incomodidades a su arrendatario, por ejemplo, alquilando otro piso de la misma casa para un establecimiento ilícito, como casa de juego o de prostitución."

■ Clemente de Diego afirma, en igual sentido: "es evidente desconocería su obligación de dejar gozar pacíficamente al arrendatario si, después de celebrado el arrendamiento, arrendase a otro la misma casa u otro piso de la misma casa *para una industria peligrosa* o para algún establecimiento ilícito (casa de juego de prostitución, etc.)". 2 De Diego, *Instituciones de Derecho Civil*, 265. (Subrayado nuestro.) Al mismo efecto véase 3 Borrell y Soler, *Derecho Civil Español*, 435 y 25 Laurent, *Derecho Civil Francés*, 153–154.

Con igual criterio Manresa comenta: "De igual modo, si el propietario de la casa que habita arrienda el piso superior al mío para que en él se establezca una industria de esas cuyo ejercicio producen ruidos o trepidaciones constantes que molestan y hacen imposible la tranquilidad de la vida familiar, no cabe duda que comete una transgresión de la obligación que le impone el núm. 3° del artículo 1.554."

■ En este caso no entra en juego la doctrina de asunción voluntaria del riesgo. Goenaga, en virtud de su contrato de arrendamiento con Francisco, era coarrendataria de West Indies y estaba en el sitio donde le daba derecho su arrendamiento a estar. *Palmer* v. *Barreras*, 73 D.P.R. 278 (1952). Prosser, *Torts*, 376 y sig.

Tampoco estamos haciendo aquí determinación alguna sobre las responsabilidades que puedan derivarse bajo el Art. 1451(11) del Código Civil (1561 C.C.E.) del vínculo arrendaticio existente entre West Indies y Francisco.

Lo que examinamos en este caso es la responsabilidad de West Indies y Francisco hacia Goenaga por la violación de un deber legal de parte de West Indies, como coarrenda-

---

(11) Véase *Cabinero* v. *Cobián Theatres*, 81 D.P.R. 960 (1960).

taria,([12]) y la violación de un deber legal de parte de Francisco, como arrendador, siendo ambas transgresiones el origen del estado de peligro que se impuso a Goenaga por ambos, y en definitiva concausa del daño ocasionado a ésta a consecuencia del incendio, ([13]) de cuya responsabilidad no puede escapar Francisco bajo la teoría de la falta de control por haber transferido la posesión a West Indies.

Francisco incumplió su obligación de ley de mantener a Goenaga en el goce pacífico de la cosa durante todo el período del arrendamiento al permitir, primero, que se creara, y luego fue negligente al tolerar, con su inacción, que continuara la situación de peligrosidad surgente de la actividad de fumigación por West Indies; y West Indies incumplió su obligación para con Goenaga, primero, al establecer la planta para el proceso de fumigación, con su potencial riesgo de incendio o explosión por el uso en ella del gas de bisulfuro de carbono, y luego, fue negligente al no tomar las medidas de

([12]) "Debe abstenerse el arrendatario en el uso de una cosa de todos aquellos actos que, aún cuando no perjudiquen directamente al arrendador, puedan causar molestias a otras personas, como, por ejemplo, *los demás arrendatarios de la misma finca;* los ruidos que perturban la tranquilidad de los vecinos de las fincas urbanas, la producción de olores fétidos o nauseabundos, etc., aún en el supuesto de que no infiriesen daño a la cosa ni perjuicio apreciable a su dueño, están prohibidas al arrendatario, *y el arrendador debe tener acción para impedirlos,* a más de que las personas en quienes la molestia se concrete especialmente, puedan también proceder contra el causante de ella." 10 Manresa, *Código Civil,* 5ta.Ed., pág. 556.

([13]) "Responde del daño causado no sólo el autor material, sino también el causante indirecto . . . *la causa de la causa es causa del efecto".* Borrell Macia, *Responsabilidades,* pág. 66. Véase Levitt. *A Passive Situation as a Proximate Cause,* 92 Cent. L.J. 390; 53 A.L.R. 327, 4 A.L.R. 740.

La doctrina española se inclina a la teoría de que en los dos supuestos del inciso 1ro del Art. 1908 del Código Civil Español (1808 nuestro), en cuanto concierne a la responsabilidad por "la explosión de máquinas que no hubiesen sido cuidadas con la debida diligencia" y "la inflamación de sustancias explosivas que no estuviesen colocadas en lugar seguro y adecuado", prevalece la noción de la presunción de culpa, 2 Puig Brutau, *Fundamentos de Derecho Civil* (2) 697–700, Borrell Macia, *Responsabilidades,* pág. 229; 2 Puig Peña, *Tratado de Derecho Civil* (2) pág. 583; 2 Díaz Pairó, *Introducción al Derecho de Obligaciones,* 65–66; 7 Oyuelos, *Digesto* 767.

cuidado y precaución y garantías técnicas aconsejadas para el desarrollo de esa peligrosa actividad. Ambos son colaboradores en la situación de peligro a que se expuso a Goenaga, y en la causa del siniestro, y bajo esas circunstancias no entra en juego aquí la teoría de la necesidad del control o posesión de la cosa, ni la de la causa próxima, respecto a Francisco, para que éste sea responsable a Goenaga junto con West Indies, de los daños por ella sufridos con motivo del incendio que destruyó su negocio. ([14])

---

([14]) Manresa, al igual que Bonel y Sánchez, es del criterio de que el *dueño del edificio* es responsable por los daños ocasionados por causas independientes de su ruina en los casos comprendidos en el Art. 1908 del Código Civil Español (1808 nuestro). 12 Manresa, *Código Civil*, 5ta. Ed., 694–697 y 4 Bonel y Sánchez, *Código Civil Español*, 900–901. Véase además Luis Muñoz, *Comentarios a los Códigos Civiles de España e Hispanoamérica*, pág. 976–977, donde se exponen criterios doctrinarios opuestos a la noción de la culpa, señalándose el criterio de Josserand de que "la razón de la responsabilidad por el hecho de las cosas estriba en que quien tiene la utilidad de una cosa debe soportar el peligro y el daño por ella ocasionado." En ese sentido véase McNiece and Thornton, *Affirmative Duties in Tort*, 58 Yale L.J. 1272. De nuestra jurisprudencia, cf. *Cole* v. *Escambrón Development Co.*, 73 D.P.R. 520 (1952); *Prado* v. *Quiñones*, 78 D.P.R. 322 (1955) y *Serrano* v. *López*, 79 D.P.R. 979 (1957).

Borrell Macia presenta así el problema, en relación con la responsabilidad del dueño del edificio en los casos señalados por el citado Art. 1908 (explosión de máquinas que no hubiesen sido cuidadas con las debidas diligencias, y la inflamación de substancias explosiva que no estuviesen colocadas en lugar seguro y adecuado, entre otros):

"Ahora bien: en el supuesto de que no sea el propietario el causante del perjuicio por las razones indicadas, sino un inquilino, ¿quién deberá indemnizar?

"Todo aquel que causa el daño interviniendo culpa o negligencia está obligado a indemnizar, de acuerdo con el artículo 1,902; pero además de su responsabilidad, ¿puede exigírsele también al propietario?

"Si el propietario del edificio lo es también de las máquinas no cuidadas con la debida diligencia, indudablemente que sí; si los humos excesivos y perjudiciales son consecuencia de la industria, es indudable que también le afectará la culpa; y si se trata de la construcción de cloacas o depósitos de materias infectantes construidas sin las precauciones adecuadas al lugar en que estuviesen, evidentemente que el propietario del edificio que los construyó será él directamente responsable.

"Ahora bien: si las máquinas son propiedad del inquilino y, por consiguiente, es él mismo quien debe velar para su conservación y perfecto funcionamiento, ¿deberá responder también el propietario del inmueble?

"En pro de la afirmativa puede alegarse que el inquilino posee la

Bajo las circunstancias apuntadas, fue error del juez sentenciador exonerar de responsabilidad al codemandado Francisco.

■ Pasemos ahora a considerar, transcribiendo *in extenso* primeramente las conclusiones del juez sentenciador al efecto, la condena en daños contra West Indies.

### Las Conclusiones de Hecho

### (Daños)

"En el fuego que siguió a la explosión ocurrida en el Edificio Rosales en junio 8 de 1946 se perdieron o se destruyeron los libros de contabilidad del negocio o fábrica de la demandante. Al ocurrir la explosión, la caja de caudales en que se guardaban dichos libros cayó desde el segundo piso hasta el sótano, chocando en su descenso con una o más de las vigas de concreto del edificio, abriéndose entonces la caja, y cayendo al piso del sótano ya abierta, sin que se hayan podido encontrar dichos libros no obstante los esfuerzos y la diligencia de la demandante.

---

finca a nombre del propietario y en virtud de un contrato por el que se estipulan las condiciones del arrendamiento y los derechos que el arrendatario tiene a usar de la finca arrendada; y, por consiguiente, está en las atribuciones del propietario prohibir la instalación de las máquinas o bien asegurarse de que no constituirán un peligro para terceras personas; y que al especificar el artículo que 'igualmente responderán los propietarios' tratándose en el anterior de propietarios de edificios, parece que a éstos hace referencia.

"En contra puede alegarse que si el propietario alquila a una persona un local, lo estipule o no en el contrato de una manera concreta, se entiende que el inquilino debe cumplir las leyes y ordenanzas referentes al uso y establecimiento de maquinaria y salvo caso de fuerza mayor, de cumplir con lo que está preceptuado, no sobrevendría la explosión; y que al referirse el artículo a propietarios, debe entenderse los de las máquinas; mas, teniendo en cuenta que éstas pueden explotar en un local cerrado, o en medio de la calle, y que este artículo es más natural que abarque todos los casos.

"Yo me inclino a creer que, aplicando el principio general de que no puede exigirse responsabilidad si no existe culpa o negligencia, a menos que se considere tal el permitir la instalación de las máquinas en el local alquilado, el propietario no es responsable de la explosión de las que no son de su propiedad.

"En cuanto a la inflamación de substancias explosivas que no estuviesen colocadas en lugar seguro y adecuado podemos decir lo mismo."

"La demandante perdió en dicha catástrofe su maquinaria, equipo y mobiliario, la mercancía ya elaborada que tenía en el taller pendiente de preparación final para embarque, la mercancía no elaborada, los patrones básicos y diseños exclusivos, y la suma de $728.00 en efectivo a que montaba el 'petty cash' de su negocio el día de la catástrofe. Como consecuencia de la destrucción de mercancía no elaborada, la demandante dejó de percibir beneficios en las ventas ya contratadas, beneficios que hubiera ciertamente recibido de no haber perdido dicha mercancía pues ya tenía ordenada la producción que se haría con la referida mercancía no elaborada.

"La demandante no era lo que corrientemente se conoce como una tallerista; es decir, no era una contratista de las que suministran trabajo o labor para elaborar trajes cuya materia prima le fuere enviada por otras personas o entidades en o fuera de Puerto Rico. La demandante era una manufacturera de ropa. Ella compraba independientemente las telas, botones, cintas, etc., elaboraba los productos terminados, tales como trajes de niños, trajes de bautizo, etc., y luego los embarcaba y vendía en Estados Unidos. Para tal empresa de manufactura la demandante tenía empleadas laborando en su taller y tenía también sub-contratistas en varias partes de la Isla. Estos sub-contratistas recogían la materia prima en el taller de la demandante, cosían y elaboraban los trajes siguiendo las instrucciones y estilos que la demandante les indicaba, y luego entregaban a la demandante en su taller los productos terminados, recibiendo allí el pago de su trabajo. Al recibir los sub-contratistas el material necesario para elaborar trajes, firmaban un documento llamado 'hoja de envío', en el cual se hacía constar el nombre y dirección del sub-contratista, la cantidad y clase de material que recibía, la fecha, las instrucciones de trabajo, el número o los números de los estilos a elaborarse o fabricarse, y varios otros detalles. Una copia de este documento era retenida por la demandante. El original se lo llevaba el sub-contratista. Cuando el sub-contratista traía y entregaba al taller los productos terminados, se firmaba igualmente otro documento llamado 'hoja de devolución', contentivo de información y detalles análogos a los de las 'hojas de envío', inclusive el número o número de los estilos de trajes elaborados por el sub-contratista.

"En cuanto al trabajo que se llevaba a cabo en el taller, éste se hacía constar en otros documentos llamados 'hojas de corte' en

que se anotaba la cantidad de tela cortada, la fecha del corte, el estilo o los estilos de trajes a ser fabricados con dicha tela, y otros detalles pertinentes. Además, de conformidad con los requisitos de la ley federal de horas y salarios, las trabajadores o empleadas del taller tenían que llenar y conservar unas libretas demostrativas del trabajo que hacían y de las horas que dedicaban a dichas tareas.

"La demandante vendía sus productos en el mercado de Estados Unidos. Tenía una representante para ventas, llamada Mrs. Helen Dudley Mohr, en la ciudad de Nueva York, y además efectuaba ventas en Estados Unidos a través de una entidad distribuidora llamada Associated Merchandising Corporation, con sede en dicha ciudad de Nueva York.

"Las facturas de ventas del negocio de la demandante estaban numeradas consecutivamente, estaban fechadas, e indicaban por estilos las ventas hechas.

"Los precios de venta de cada estilo fabricado y vendido por la demandante eran intervenidos, controlados y fijados por la Oficina de Administración de Precios federal, cuya agencia analizaba los costos de producción, y fijaba los precios de venta, por cada docena de cada estilo de trajes fabricado.

"La maquinaria, equipo y mobiliario que tenía la demandante en su taller en el Edificio Rosales, y que fue destruido por la explosión y fuego ocurridos en junio 8 de 1946, consistía de los efectos o 'items' relacionados en el Exhibit 15 de la Demandante y en sus dos anexos.

"La mercancía ya elaborada que perdió la demandante por destrucción en dicha explosión y fuego es la que aparece relacionada en detalle en el Exhibit 16 de la Demandante, sustanciado y probado satisfactoriamente por el testimonio de la demandante, por los anexos 1, 2, 3, 4 y 5 de dicho exhibit, por la estipulación de las partes y por el informe del Contable E. J. Lugo (Exhibit O de West Indies, en 'rebuttal'). Dichos exhibits y anexos demuestran el material enviado a los sub-contratistas por la demandante desde enero 1 de 1945 hasta la fecha de la explosión y el fuego, así como los trajes o mercancía y elaborada entregada por los sub-contratistas al taller en dicho período de tiempo. Revelan también la mercancía elaborada que se hizo en el taller en el mismo período de tiempo, y las ventas de mercancía elaborada durante dicho período, y su valor en dinero, o sea, el precio de venta autorizado para dicha mercancía por la O.P.A., el cual coin-

cide con el que aparece en las facturas de ventas de la demandante. Así, dichos exhibits y anexos, en lo que todo figura por estilos, arroja un resultado razonablemente exacto indicativo de lo que en realidad había en el taller de la demandante, en mercancía elaborada, el día en que ocurrió el siniestro.

"La mercancía aún no elaborada que perdió la demandante por destrucción en dicha catástrofe es la que aparece listada en su Exhibit 17, sustanciado y probado satisfactoriamente por sus anexos, por la estipulación de las partes, por el testimonio de la demandante, y por el informe del Contable Lugo. Esta prueba demuestra las compras y recibo de materiales de la demandante desde enero de 1945 hasta junio 8 de 1946, así como el material usado en la elaboración de trajes y productos durante el mismo período de tiempo. Deduciendo lo segundo de lo primero, se demostró la existencia o inventario de mercancía o materiales no elaborados que había en el taller de la demandante el día del fuego. El valor de esta mercancía o materiales consta en las facturas de compra sometidas.

"Los beneficios dejados de percibir por la demandante, al no poder llevar a cabo las ventas que ya tenía contratadas en junio 8, 1946, aparecen en su Exhibit 18, sustanciado y probado adecuadamente por sus anexos, por el testimonio de la propia demandante y por la estipulación de las partes. Esta evidencia comprueba la tela y otros materiales comprados, recibidos y no usados aún a la fecha del fuego, los estilos o modelos de trajes que habrían de fabricarse con dichas telas y materiales, la cantidad de telas y materiales a usarse en cada docena de trajes o estilos, y el número de docenas de trajes de cada estilo que se habría fabricado, y el precio de venta fijado por la O.P.A. para cada docena de cada estilo, de cuyo precio se deduce el costo de producción y venta de cada docena, según autorizado también por la O.P.A., resultando así el beneficio neto por docena. Demuestra también la prueba las órdenes pendientes de despacho que tenía la demandante, revelando dichas órdenes el número de docenas de trajes ya contratados y el estilo de cada traje ordenado, lo que coincide con los estilos que habrían de fabricarse con las telas y materiales comprados y recibidos.

"Los patrones básicos y diseños exclusivos destruidos por el fuego fueron 17 en número. Estos patrones y diseños tienen un valor real y efectivo, y su destrucción ocasionó a la demandante la pérdida del tiempo invertido originalmente por ella en crearlos.

Sin embargo, habiendo utilizado desde 1943 hasta 1946 los patrones 400, 1400, 700, 1700, 900 y 1900; y desde 1944 hasta 1946 los patrones 8900, 200, 1200, 500, 100 y 3700; y desde 1945 hasta 1946 los patrones 8200, 8800, 1600 y 300, la demandante tan solo perdió en efecto el tiempo invertido en cada patrón menos el valor razonable del uso dado a cada patrón, debiendo por tanto reducirse la compensación reclamada por este concepto."

Ocurrió que al terminar su prueba relativa a responsabilidad y a los fines de la presentación de su prueba de daños, la demandante sugirió la designación de un *Master* bajo la 53 de las anteriores Reglas de Enjuiciamiento Civil, a lo que objetó West Indies, anunciando Goenaga entonces que en la siguiente sesión vendría "a probar partida por partida". El tribunal instó a las partes a llegar a algún acuerdo, y en la siguiente sesión, convenida por todas las partes, se produjo la siguiente

"ESTIPULACION

"Con el fin de acelerar el juicio y simplificar el procedimiento, las partes estipulan lo siguiente en cuanto al procedimiento para presentar la prueba de los daños y perjuicios que la demandante reclama en este caso:—

"1—La parte demandante podrá comenzar con la declaración verbal de la demandante y de cualesquiera otro testigo o testigos respecto al montante de los daños. En tanto en cuanto dicha declaración o declaraciones se basen en constancias de documentos obrantes en poder de la demandante, no será preciso que se presenten dichos documentos en evidencia, bastando con que los documentos se identifiquen y se dejen en poder del Tribunal, clasificándose los documentos a base de las seis partidas en que se descompone la reclamación de daños. Tampoco será preciso que, en el examen directo de dichos testigos, se establezcan todas las partidas que componen cada una de las seis partidas principales de daños que se reclaman, aceptando los demandados que los testigos limiten su declaración, en examen directo, al montante total de dichas seis partidas principales, conviniéndose entre las partes que las partidas de daños en esa forma sustanciadas se darán por probadas, pero si alguna de ellas fuere impugnada por los demandados entonces el Tribunal resolverá sobre su proce-

dencia a base de la evidencia directa, la de impugnación y la que presente la demandante en rebuttal.

"2—Terminada la prueba directa de la demandante respecto a los daños, en la forma ya expuesta, y la repregunta de los testigos de la demandante, se procederá a la presentación de la prueba de los demandados, en cuanto a la responsabilidad de los demandados, terminada la cual podrá la demandante presentar prueba de rebuttal en cuanto a ese mismo extremo, y los demandados de surrebuttal. Terminada la prueba respecto a la responsabilidad de los demandados, si éstos no están aún preparados para presentar su prueba en cuanto al montante de los daños, por no haber concluido aún el cotejo de la documentación que respecto a daños hubiese sido identificada por la parte demandante, se suspenderá el juicio por un tiempo razonable para dar fin a dicho cotejo.

"3—La prueba documental que identifique la demandante y deposite con el Secretario, y la que ya ha depositado e identificado la demandada West Indies Trading Corporation, estará a la disposición de los abogados de las partes, y de los contables que designen las partes para examen y estudio. El secretario tomará las medidas pertinentes para evitar se extravíe dicha documentación.

"4—Tan pronto termine el estudio y cotejo de la documentación depositada con el Secretario del Tribunal, o tan pronto expire un término razonable para dichos fines, las partes, o cualquiera de ellas, solicitarán señalamiento para la continuación del juicio, procediéndose entonces a oir la prueba de los demandados respecto al montante de los daños, concluida la cual podrá la demandante presentar prueba de rebuttal, y los demandados de surrebuttal."

La anterior Estipulación, aprobada que fue por el magistrado que conoció del juicio en sus méritos, rigió los procedimientos para la presentación de la prueba sobre los daños reclamados por Goenaga.

West Indies dedica el Quinto Punto de su extenso alegato a sostener que fue error del juez sentenciador admitir la evidencia sobre daños presentada por Goenaga y contenida en los informes o estados Primero, Segundo, Tercero, Cuarto y Quinto y los documentos en que se fundaron los mismos (Exhibits XV, XVI, XVII y XVIII de la demandante), en negarse

a eliminar esa prueba del récord y en basar sus conclusiones sobre el monto de los daños en dicha prueba.

Precisa recordar que Goenaga anunció, al terminar su prueba sobre responsabilidad, que procedería a probar los daños reclamados, partida por partida, al objetar West Indies la designación de un *Master*. La Estipulación sometida por las partes dispensó de la presentación formal en evidencia de la prueba documental de Goenaga, consistente en comprobantes, facturas, conocimiento de embarques, etc., a base de la cual se prepararon, clasificándose por tipo de pérdida sufrida, los estados o informes presentados y sometidos por la demandante y a los cuales hizo referencia verbalmente en su testimonio en el tribunal de instancia. En dicho testimonio, Goenaga explicó el proceso seguido para la comprobación de las pérdidas por ella sufridas con motivo del incendio. En esencia, substanció los informes preparados a ese fin. De parte de los demandados no hubo, en efecto, impugnaciones específicas a las partidas de daños así verificadas por Goenaga, siguiendo la forma y manera acordada para la presentación de su prueba.

· Mediante la Estipulación de referencia, las partes se obligaron a que no sería necesario que se estableciera mediante la prueba testifical de Goenaga todas las partidas que componían cada una "de las seis partidas principales de daños" reclamadas, habiéndose aceptado por los demandados que dicha prueba testifical se limitara en el examen directo "al montante total de dichas seis partidas principales, *conviniéndose entre las partes que las partidas de daños en esa forma sustanciada se darán por probadas*" pero que "si alguna de ellas fuere impugnada por los demandados entonces el tribunal resolverá sobre su procedencia a base de la evidencia directa, la de impugnación y la que presente la demandante en rebuttal." West Indies ofreció en evidencia, también a base de la Estipulación, un informe preparado por el Contador Público Eurípides J. Lugo, basado en su examen de los informes de Goenaga y de los

documentos en comprobación de los mismos. Dicho informe, que fue objeto de réplica por Goenaga—como fue objeto de fuerte interrogatorio el propio contable en la silla testifical— no desvirtuó la prueba de la demandante respecto a los daños.

El Informe I de Goenaga (Exhibit XV) contiene una lista del equipo, maquinaria y mobiliario del taller, con sus costos originales y sus valores de reposición a la fecha del fuego, comprobado dicho Informe por dos anexos relacionando dichos renglones—el anexo 1 con las facturas indicativas del valor original de dicho equipo, y el anexo 2 con la indicación del costo de reposición.

El Informe II (Exhibit XVI) de Goenaga es un estado de la mercancía elaborada perdida en el fuego y su valor tomando como base la fecha de 1ro de enero de 1945 hasta la fecha del incendio. Este estado quedó debidamente acreditado mediante los originales de las hojas de envío de cada subcontratista a quien Goenaga enviaba telas y otro material para elaborar. Estas hojas de envío las obtuvo Goenaga de los propios subcontratistas. Igualmente obtuvo de éstos las hojas de devolución, o sea, las constancias de lo que los subcontratistas habían devuelto a Goenaga en mercancía elaborada, correspondiente a los materiales que le habían sido previamente remitidos. De conformidad con estas hojas determinó exactamente cuanta mercancía elaborada *por estilos* se devolvió por los subcontratistas al taller en el período de tiempo indicado. Una vez constatada así la mercancía elaborada en ese período, se comprobaron las ventas durante el mismo lapso de tiempo también *por estilos*, y el resultado arrojó la mercancía elaborada en el taller a la fecha del incendio. Esta corresponde a 56 estilos de los 100 ó más estilos de trajes que Goenaga fabricaba y vendía. (15)

---

(15) El esquema del procedimiento seguido por Goenaga para la comprobación de su reclamación por pérdida de mercancía elaborada, se señala sólo como ejemplo para indicar la precisión con que la demandante llevó a cabo el arduo proceso de comprobación de las distintas partidas de daños sufridos con motivo del incendio en su negocio. Cada uno de los

Los Informes III y IV contienen el detalle relativo a la mercancía no elaborada y su valor, existentes en el taller a la fecha del incendio, comprobándose con los documentos y récords y que se refieren los anexos 1, 2 y 3(a) del Informe III y los anexos 1 y 2 del Informe IV.

El Informe V (Exhibit XVIII) establece en detalle los beneficios dejados de percibir y tiene como base los récords y documentos identificados y sometidos al Tribunal de instancia, los cuales fueron objeto de examen y estudio por el Contable Lugo, de West Indies, que produjo el Informe a que nos hemos referido anteriormente.

No podemos convenir, bajo los términos de la Estipulación suscrita por las partes, y del examen detenido de los Informes, sus anexos y los documentos en que fundaron los mismos, de que carezca de base la reclamación de Goenaga. Las partes quedaron obligadas por la Estipulación, y Goenaga tenía derecho a descansar en los términos de la misma y en que ésta surtiría el efecto legal que de sus propios términos se implicaba. En verdad, convenida entre las partes que las partidas de daños reclamados por Goenaga, una vez sustanciadas en la forma estipulada, *se darían por probadas,* los codemandados prácticamente delegaron en el contable Lugo, sin éxito, la función legal de impugnar dichas partidas.

La base de la prueba de Goenaga sobre daños es razonable y no es hija "del capricho o la adivinación." *White Star Bus Line* v. *Glens Falls Indemnity Co.,* 60 D.P.R. 852. (1942) Cualquier incertidumbre que pudiera atribuirse a la prueba de Goenaga, en cuanto a la manera de calcular los daños, sería "una incertidumbre causada por el mismo acto ilegal del demandado y la justicia y el orden público requieren de consuno que sea él quien sufra el riesgo de la incertidumbre así causada." *White Star Bus Line* v. *Glens Falls Indemnity*

---

cinco informes sobre daños, sustanciados por varios anexos y documentos correspondientes, así como por su propio testimonio, comprobaron la reclamación de Goenaga que estimó procedente el juez sentenciador.

*Co.,* supra. Véanse, además, *Package Closure Corp.* v. *Sealright Co.,* 141 F.2d 972; *Palmer* v. *Connecticut Railway & Light Co.,* 311 U.S. 544, 85 L.Ed. 336; *Story Parchment Co.* v. *Paterson Parchment Paper Co.,* 282 U.S. 555, 75 L.Ed. 544; *Bigelow* v. *RKO Radio Pictures,* Inc., 327 U.S. 251, 90 L.Ed. 652.

■ Con excepción de la inadvertencia del juez sentenciador al conceder $1,384 de más ($42,962) en la partida por pérdida en la mercancía ya elaborada, ya que la demandante en su testimonio declaró que fue la suma de $41,578, y del error—admitido en el Informe de Refutación de Goenaga —de haber reclamado $69.75 de más en la partida de equipo, mobiliario y maquinaria (renglón 77), no estamos en condiciones de alterar la conclusión hecha por el juez sentenciador en cuanto a los daños. ([16])

Por el Sexto Punto de su alegato West Indies sostiene que la conclusión del tribunal de instancia de que los libros de cuentas y récords de la demandante fueron destruidos por el fuego está basada en evidencia tan palpablemente falsa y absurda que razonablemente no es merecedora de crédito.

Sobre este extremo la conclusión del juez sentenciador fue "los libros de contabilidad de la demandante se perdieron o quemaron en el siniestro." La prueba de la demandante no fue específicamente que se quemaron, sino que ella no los pudo recobrar después del incendio.

## Conclusión

West Indies y Francisco son solidariamente responsables por los daños y perjuicios sufridos por Goenaga con motivo del incendio, en la suma de $130,951.04. *En consecuencia se revocará la sentencia dictada por el tribunal de instancia en este caso en aquella parte que exoneró a Miguel Francisco y se declarará también con lugar la demanda en cuanto a*

---

([16]) Las referidas cantidades serán deducidas de las correspondientes partidas y del total de aaños concedidos.

*éste; se modificará la sentencia en su pronunciamiento de daños, rebajándose éstos a la suma de $130,951.04, y se condenará solidariamente a Miguel Francisco y a West Indies Trading Corporation a pagar solidariamente a Conchita de Goenaga la referida cantidad por concepto de daños, con las costas y la suma concedida de $10,000 para honorarios de abogado.*

